In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-3310

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

KEITH SLOAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 586-11—**Harry D. Leinenweber**, *Judge.*

ARGUED APRIL 13, 2006—DECIDED OCTOBER 11, 2007

Before COFFEY, KANNE and WILLIAMS, *Circuit Judges.*

COFFEY, *Circuit Judge.* After being charged with three counts of mail fraud, an aspiring young lawyer named Keith Sloan entered into a plea agreement with the government that allowed him to plead guilty to a single misdemeanor count of making a false statement to the Department of Housing and Urban Development (HUD) (rather than face the three felony counts he was originally charged with), in exchange for his promise to cooperate and testify against his co-defendants in the fraudulent real estate financial scheme in which he had been a willing and ongoing participant. Somehow, satisfied with the defendant's cooperation, the government did not recommend incarceration, and the judge sentenced him to

a term of three years of probation, and at the same time imposed joint and several liability with ten of his co-defendants for $638,396.47 in restitution[1] and 200 hours of community service. The government obtained an order of garnishment in order to collect the restitution from Sloan who has appealed the order. WE AFFIRM.

On July 25, 2000, a federal grand jury returned a sixteen-count indictment charging Sloan and his nineteen co-defendants with a scheme to defraud HUD and a number of other private mortgage lenders. Three of the counts charged Sloan with the commission of mail fraud felonies in violation of 18 U.S.C. § 1341. Sloan had graduated from the Northern Illinois University Law School just prior to the date of sentencing (January 31, 2002). Thus, with his being allowed to plead guilty to a misdemeanor (rather than three felonies), for reasons unexplained, the defendant was allowed to be admitted to practice law in Illinois.[2] After the completion of Sloan's probation, during which time he had made only a pittance of a payment on the restitution ordered, the government secured an order of garnishment in hopes of collecting the outstanding balance of $3,886,004.94 (an amount which included accrued interest) of the restitution previously ordered from him on the joint and several liability premise. Sloan, the defendant-appellant, chal-

---

[1] Although Sloan had a total of nineteen co-defendants, on the recommendation of the prosecutor the court only imposed restitution on Sloan and nine others.

[2] At the time of his sentencing hearing in January of 2002, Sloan had completed Northern Illinois University College of Law and was awaiting clearance from the Illinois Board of Admissions Committee on Character and Fitness. Sloan was admitted to the Illinois Bar on November 10, 2005. He practices with the law firm of Madsen, Sugden & Gottemoller in Crystal Lake, Illinois.

lenged the order arguing, for the first time, that the order of restitution was entered without statutory authorization. Furthermore, it should be made clear that he did not challenge the restitution order at the time of sentencing. The district court denied his objection and entered an order of continuing garnishment. Sloan appeals.

Because a garnishment order is a final appealable order, *see United States v. Mays,* 430 F.3d 963, 965 (8th Cir. 2005) ("A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."), *cert. denied,* 126 S.Ct. 1416 (2006), *quoting Catlin v. United States*, 324 U.S. 229, 233 (1945); *Central States, Southeast and Southwest Areas Pension Fund v. Express Freight Lines, Inc.,* 971 F.2d 5, 6 (7th Cir. 1992) ("A contested collection proceeding will end in a judgment or a series of judgments granting supplementary relief to the plaintiff [in this garnishment case, the government]. The judgment that concludes the collection proceeding is the judgment from which the defendant can appeal."), this court has jurisdiction to hear the appeal. *See* 28 U.S.C. § 1291 ("The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States. . . . "); *United States v. Rand,* 403 F.3d 489, 493 (7th Cir. 2005) ("28 U.S.C. § 1291 . . . provides for appeals from final orders of the district courts . . . ."). Because the order of garnishment is valid, we affirm.

## I. BACKGROUND

Keith Sloan came in contact with his co-defendant Robert Voltl, a practicing attorney, while Sloan was a student on summer break from undergraduate studies at Purdue University and was employed as a part-time pro shop attendant at a golf course in Dundee, Illinois. In May

of 1993, Sloan advised Voltl that he had completed a paralegal program at Roosevelt University in Schaumburg, Illinois.[3] He inquired about the possibility of employment in Voltl's law office in Chicago, Illinois. Voltl hired him as a full-time paralegal[4] in May of 1993. He continued in that capacity until he entered law school in 1998.

The original felony indictment charged him with a fraud scheme, commencing in the month of August 1995, and continuing until at least January of 1998. Sloan and his nineteen co-defendants perpetrated and perpetuated a scheme to defraud HUD. The initial step in the scheme was to purchase a piece of property by paying the full sales price without having to borrow funds against the value of the property (first purchase). Brian Parr and several other co-defendants, in the fraudulent scheme, went in search of parcels of real estate to purchase with the intention of reselling them to second purchasers they recruited. A number of the defendants continued to recruit other "straw purchasers"[5] to buy these properties immediately after their initial purchase at fraudulently

---

[3] Despite Sloan's claim to have enrolled, studied and completed a paralegal program, his Presentence Investigation Report (PSR) states: "A response from this school indicated that they had no record of the defendant attending [Roosevelt] [U]niversity [in Illinois]." The record is barren of any information as to whether or not he ever attended Roosevelt University.

[4] The PSR states: "The defendant was employed full-time by Robert Voltl as a law clerk. He earned $14 per hour and he resigned from this position in order that he might attend law school full-time." The terms "law clerk" and "paralegal" are not synonyms.

[5] In the context of real estate sales, a "straw purchaser" is a person who is knowingly purchasing property to conceal the identity of the real purchaser who is not able to complete the transaction in his or her own name. *See United States v. Dollar,* 25 F. Supp. 2d 1320, 1323 (N.D. Ala. 1998).

inflated prices. The straw purchasers, in turn, received cash payments from a number of the named defendants in exchange for allowing the defendants to use their individual credit histories. Other second purchasers were told that they could purchase residences with "no money down" and receive cash back at closing.

In order to facilitate the second purchases, many of the named defendants, including Sloan as well as various agents and representatives of the innocent lenders, actually participated in the creation of the fraudulent documents used on behalf of the second purchasers in support of the inflated second purchase prices. These fraudulent documents were submitted to lenders during the mortgage application and approval process with the intent of ensuring that the second purchasers would qualify for mortgage loans from lenders. Two of the defendants, Tamara Smith and Nancy Zimmerman, had the duty of creating the fraudulent real estate appraisals in support of the second purchase prices. The inflated appraisals were also submitted to the lenders with the purpose of ensuring that the inflated mortgage loans would be issued.

A number of the defendants assisted in the closings during the second real estate purchase transactions by arranging for the parties on both sides of the closings to be represented by Robert Voltl even though there was an obvious conflict of interest. Voltl facilitated the completion of both the first and second purchases by scheduling the second purchase closing at an earlier time so that the proceeds from the sale could be used to make the first purchase. In this way the defendants used the proceeds from the mortgage loans to finance properties for second purchasers even though the first purchaser had not yet acquired the title. Occasionally, after the completion of the two purchases, combinations of defendants

would enable the refinancing of the very same property by the creation of other fake documents to accompany the inflated appraisals.

Throughout the scheme the defendants profited from the difference between the inflated second purchase price and the initial purchase price (the spread). The spread often exceeded $100,000.00 per piece of real estate. These proceeds funded illegal payments to the defendants such as Tamara Smyth and Nancy Zimmerman for their participation in the fraudulent purchase and resale scheme. The defendants persuaded the lending companies to issue inflated mortgage loans on at least seventy-seven properties in the Chicago area. The loans exceeded ten million dollars of which more than three million dollars were insured by HUD[6] and the Federal Housing Administration (FHA).[7]

---

[6] The United States Department of Housing and Urban Development (HUD) was the governmental entity that provided insurance protection guaranteed by the United States government to private lending institutions which were engaged in financing federally-insured mortgage loans to qualified buyers.

[7] The Federal Housing Administration (FHA) was the organizational unit within HUD that administered HUD's mortgage insurance program. In the case of federally-insured mortgage loans, applicants were required to submit information to their lenders and to HUD. The information included the applicant's employer's name, the applicant's social security number, date of birth, monthly gross pay, prior ownership of property, assets, and liabilities. In addition, each applicant was required to certify that he or she was going to occupy the property for which he or she was seeking a mortgage; further, that neither he or she had filed for bankruptcy within the past seven years, that he or she had no outstanding judgments and that he or she had never been subject to any foreclosures. The applicant was also required to certify the amount of the down payment that he or she was making on a property.

Each of the twenty defendants in this fraudulent enterprise performed his or her own particular role which was connected somehow with his or her respective employment responsibilities. Robert Voltl, with the assistance of Keith Sloan and co-defendant Sandra Lesniewski (another paralegal in the firm), knowingly prepared materially false and misleading documents dealing with the sales of the properties for presentation to the lenders at closing. After fraudulently obtaining these monies from the lenders, Voltl, along with Sloan and Lesniewski, wrote checks from his own client trust account to various payees in order that he might fund the first "cash" purchase and also to compensate his co-schemers.

Sloan, at the direction of Voltl, regularly attended the real estate closings, notarized the documents and prepared all necessary documents, as well as signing the necessary checks on behalf of Voltl. As an example, during the closing process on the property being sold to Edward Scott Ellis, Sloan knowingly and fraudulently notarized the signatures of Ellis and his wife (while neither of them was in his presence) on the lender's Articles of Agreement, which also falsely stated that they had sold their home.[8] Based on the documents notarized by the defendant Sloan, Ellis was approved for a HUD-insured loan in the amount of $158,000. Within months after the closing, Ellis stopped making mortgage payments, resulting in a net loss on this property to the United States of approximately $173,211.62.

---

[8] The Illinois Notary Public Act provides that: "In witnessing or attesting a signature, the notary public must determine, either from personal knowledge or from satisfactory evidence, that the signature is that of a person appearing before the notary and named therein." 5 Ill. Comp. Stat. 312/6-102(c) (2005) (The Act became effective in 1986). This statute requires that the person or persons signing the document must be physically present when the notary attests to their signatures.

Under the direction of Voltl, Sloan assisted in handling
real estate closings for a co-defendant named Brian Parr.
Also, on other occasions, Sloan often notarized the signa-
tures on the closing documents in spite of the fact that
the parties were not physically present at the time of
signing in violation of the law. *See* 5 Ill. Comp. Stat. 312/6-
102 (2005). Furthermore, on multiple occasions, Sloan, also
at Voltl's direction, knowingly signed the name of one
Ahmad Martins (a.k.a. Brian Parr) on warranty deeds
when he was without authorization. On a few occasions,
Voltl asked Sloan to fill out title fund commit-
ment forms setting forth that Brian Parr had sold a
parcel of property when in fact Parr and Sloan were
both well aware that Parr did not have legal title to the
land. On a number of occasions, also at Voltl's direction,
Sloan fraudulently inscribed Voltl's name on checks used
at closings for down payments that should have been paid
by the buyers pursuant to the terms of the loan documents
and the HUD guarantees. From 1995 to 1998, Sloan
facilitated the purchase or sale of at least fourteen "flips"[9]
of properties.

The lure and scheme used by the defendants was to
recruit buyers for this fraudulent enterprise with an offer
to sell them property with "no money down." Thus, in
effect, they were essentially purchasing parcels of real
estate without using any of their own money. In some
circumstances, when necessary, the initial buyers first
rented the properties to other parties and used the funds
received from either the rental or the sale to pay off the
loans. In this way, the buyers were able to live in the
property rent free or sell. By assisting these buyers in
certifying falsely that they had used their own money for

---

[9]   To "flip" is "[t]o buy and then immediately resell . . . real estate
in an attempt to turn a profit." *Black's Law Dictionary* 670 (8th
ed. 2004).

the down payments, Sloan defrauded HUD. When a property was forced into foreclosure proceedings, it was sold for the true value of the property and not for the fraudulently inflated value of the false appraisal and payout, resulting in HUD incurring a substantial financial loss.

In 1998, Sloan resigned from Voltl's firm and entered the Northern Illinois University College of Law in DeKalb, Illinois, and matriculated there from August 25, 1998, until May 26, 2001, when he obtained his Juris Doctor degree. On July 25, 2000, a Special Grand Jury for the Northern District of Illinois had returned a sixteen-count indictment against Sloan and nineteen other co-defendants. On August 7, 2000, Sloan entered a plea of "not guilty" before a magistrate judge and was released on a $4,500 personal recognizance bond. Subsequently, as pointed out earlier, he entered into a plea agreement with the government, and on May 14, 2001, Sloan appeared before the district judge, withdrew his pleas of not guilty to the felony counts, and entered into the written guilty plea agreement referred to herein. Pursuant to the written and negotiated plea agreement between the United States and the defendant, the United States Attorney withdrew the original three-felony indictment. After the felony charges were dismissed on May 23, 2001, a one-count superceding information was filed charging Sloan with a misdemeanor rather than with the original three felonies. The new information recited that on or about April 30, 1996, the defendant Sloan, with intent to defraud, caused a material misstatement to be made on a residential loan application document with HUD. The information explained:

> that defendant witnesses Individuals A and B [Edward Scott Ellis and his wife] sign an Articles of Agreement, dated March 26, 1996, indicating that they had sold 2276 McCartney Drive, Naperville, which was a

> prerequisite to HUD insuring the residential real estate loan, when in fact defendant did not witness Individuals A and B sign the Articles of Agreement and did not know if Individuals A and B had signed the Articles of Agreement.

Sloan's failure to witness the signing was a misdemeanor in violation of 18 U.S.C. § 1012.

In the signed plea agreement, Sloan voluntarily acknowledged his criminal conduct that formed the basis for the charge and stipulated to his participation in the fraudulent scheme, although he somehow now denies it. It is interesting to note that Sloan acknowledges that he has read the agreement and that he fully understood each and every element of the crime with which he has been charged as set forth in the document. He admits that he acted with intent to defraud as a matter of law. Also in the plea agreement, Sloan promised to cooperate with the government in the trial of co-defendants Robert Voltl and Reginald Owens.

As to the restitution, the parties agreed that the defendant's relevant conduct, referred to in the plea agreement, formed the basis for the charge and that the net loss for all of the properties involved was $641,183.69, less any amounts recovered by the lenders after the sale of the properties following any foreclosures. The government proceeded on the theory (which Sloan did not contest) that the offense to which Sloan pled guilty, including the relevant conduct, was an offense against property[10] committed by fraud or deceit and required an order of

---

[10] Under 18 U.S.C. § 3663A, an "offense against property" includes all property crimes included in Title 18 of the United States Code or under section 416(a) of the Controlled Substances Act, 21 U.S.C. § 856(a), including any offense committed by fraud or deceit. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). *See also* footnote 14, *infra.*

restitution pursuant to 18 U.S.C. § 3663A.[11] The plea agreement also provided that "[t]he defendant reserves the right to contest the entry of the order of restitution." The plea agreement signed and approved by the defendant also contained the following provisions:

> Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. The defendant *knowingly waives the right to appeal any sentence imposed in accordance with the agreement* or the manner in which that sentence was determined, in exchange for the concessions made by the United States in this Plea Agreement. The defendant also waives his right *to challenge his sentence* or the manner in which it *was determined in any collateral attack*, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to the waiver or to its negotiation.

Plea Agreement ¶ 11 (emphasis supplied).

In the plea bargain the parties requested that the court take the following factors into consideration when calculating the sentencing guidelines range:

(1) the relevant conduct exceeded $500,000, but was less than $800,000;

(2) Sloan's participation in the crime involved more than minimal planning;

---

[11] Although the three felony charges contained in the original indictment were offenses against property committed by fraud or deceit which required an order of restitution, the misdemeanor to which Sloan pleaded guilty was not a crime against property and did not require an order of restitution.

(3) Sloan's use of his special skills as a paralegal and a notary in committing the crimes charged;

(4) Sloan was a minor participant in the scheme to defraud;

(5) Sloan had no criminal history; and

(6) Sloan was to be credited with accepting responsibility[12] and cooperating.

On January 31, 2002, Sloan, along with his counsel, participated in his sentencing hearing. When specifically asked by the presiding judge about the accuracy of the PSR, all parties agreed to it and neither party offered any corrections. The sentencing hearing transcript contains the following exchange:

> THE COURT: Mr. Sloan, are you satisfied that it [facts and conclusions in the PSR] is accurate factually?
>
> THE DEFENDANT [Keith Sloan]: Yes
>
> THE COURT: Is the government satisfied—
>
> MR. POWERS [Assistant United States Attorney]: The government is, as well.

The district judge next inquired of the parties before the court about restitution:

> THE COURT: The restitution is—
>
> MR. POWERS: If I may, Your Honor. The restitution has come down slightly for this defendant. The figure

---

[12] In a section titled "Adjustment for Acceptance of Responsibility," Sloan's Presentence Report states that: "The defendant admitted to his participation in the instant offense through his written plea agreement acknowledging his involvement. He meets the criteria for the third-point decrease under § 3E1.1(b) because his offense level is greater than 16 and he timely notified authorities of his intention to plead guilty."

that we would ask the court to enter is $638,396.47 [the original dollar amount had been reduced due to payments made by co-defendants].

THE COURT: Is that correct, Mr. Polachek [attorney representing Keith Sloan]?

MR. POLACHEK: I agree with that, yes.

THE COURT: The restitution is set at—I am going to waive the fine because of the restitution requirement—$638,396.47, . . . .

The government *moved for a downward departure based upon Sloan's promise to cooperate at the trial of the co-defendants Voltl and Reginald Owens.*[13] *During Sloan's allocution, he made no mention of, nor did he refer to or dispute, the amount set forth in the agreed upon restitution, nor did he deny, much less challenge, the statement therein that he participated in the scheme to defraud. At the conclusion of the hearing, and after having heard all the parties, the court found Sloan jointly and severally liable with ten co-defendants for $638,396.47 in restitution. Additionally, the court entered a judgment of conviction and sentenced Sloan to three years of probation and 200 hours of community service.*

---

[13] At the sentencing hearing the government told the court that:

> . . . Mr. Sloan provided substantial assistance to the government in the investigation. He was proffered several times by the agents in court today. Mr. Carver and Mr. Linsler, the two case agents. He met with the government both plea-indictment [sic] and post-indictment. He was prepared to testify. Again, Your Honor did not have the benefit of hearing his testimony because the government made a decision not to call him as a witness but it was not due to any unwillingness on the defendant's part.

Despite the provision in the plea agreement allowing Sloan to contest the entry of the order of restitution, at no time during the proceedings did he dispute or object to the amount of restitution or to the entry of the order or any segment thereof. Sloan neither appealed nor collaterally attacked his sentence. *If the defendant had believed there was any error, he could have moved to correct a substantive error in a sentence within seven days of the entry of judgment under Federal Rule of Criminal Procedure 36. Sloan never saw fit to file such a motion.*

On March 22, 2005, the government applied to the court for a writ of continuing garnishment to collect Sloan's outstanding restitution[14] pursuant to a provision of the Federal Debt Collection Procedure Act, 28 U.S.C. § 3205. Thereafter, the government commenced a civil action for an order of garnishment because, on March 9, 2004, Sloan had successfully convinced the court to terminate his three-year period of probation after only twenty-six months. Payment of restitution had obviously been a paramount condition of Sloan's probation. Once this term of probation was completed, the government, in order to protect its interest in the order of restitution, sought an order from the court for a *continuing* garnishment.

The district court issued the writ of garnishment to Sloan's employer, the law firm of Madsen, Sugden & Gottemoller in Crystal Lake, Illinois, and Sloan was properly served with notice of the writ and application. *See* 28 U.S.C. § 3205. Sloan's employer filed an answer to the writ stating that Sloan was paid weekly and

---

[14] Sloan had been making payments on the court-ordered restitution as a condition of his probation. With probation completed, the court, as requested, issued an order for *continuing* garnishment for the amount of restitution which remained unpaid.

that the amount sought by the government—twenty-five percent of Sloan's disposable earnings— presently equaled $147.76.[15] The United States then moved for a garnishment order directing the employer to remit twenty-five percent of Sloan's weekly disposable income to the Federal Court Registry until the entire judgment of restitution in the amount of $638,396.47 for which Sloan and the other defendants were held to be jointly and severally liable is paid.

Sloan responded by attempting to make an end run around the garnishment order by alleging that the original restitution order (to which he had agreed in writing and in open court) had exceeded the court's authority, and the government responded, by pointing out that Sloan had specifically agreed to the amount of restitution ($638,396.47). Furthermore, he never challenged the restitution order at any time during the sentencing hearing or thereafter until this action. Sloan without leave of the court filed an unauthorized supplemental response asking that his response to the garnishment be treated as a petition for a writ of error *coram nobis* or as a motion for relief under Federal Rule of Civil Procedure 60(b)(4). Sloan claimed that the restitution order was illegal because it was issued without either jurisdiction or statutory authority. In an oral ruling following the garnishment hearing, the district court concluded that Sloan's challenge to the restitution order was not filed timely (within seven days of the entry of the order. *See* Federal Rule of Criminal Procedure 35(c)) and granted the order of garnishment, which was entered on June 10, 2005.

---

[15] The Consumer Credit Protection Act, 15 U.S.C. §§ 1671, et seq., prohibits a wage garnishment in excess of 25% of an employee's weekly disposable earnings.

This appeal followed. The government describes the situation as follows and we agree:

> Three years after Keith Sloan received the benefits of a plea agreement (including dismissal of all his felony charges), he unsuccessfully tried to renege on his written agreement not to collaterally attack his sentence. His belated attempt to vacate the restitution portion of his sentence—that he and his attorney explicitly agreed to—was correctly rejected by the district court. Sloan's challenge should be rejected out of hand because he voluntarily signed a plea agreement supported by consideration not to collaterally attack his sentence and now he is collaterally attacking the sentence.

Brief and Appendix of the United States at 6-7.

## II. DISCUSSION

Sloan raises one issue on appeal: "Whether the Court erred when it entered an Order of garnishment enforcing the restitution portion of the criminal judgment which he contends was invalid as being beyond the statutory authority conferred upon the District Court by the superceding criminal information to which Sloan had pled guilty." Although Sloan attempts to focus on the restitution order, we wish to make clear and point out that he did not appeal that order as he appealed only the order of garnishment. The garnishment action was brought in a collateral proceeding to the underlying criminal action against Sloan. The authority to order garnishment is a question of law and is reviewed *de novo.* *See In re Southwestern Glass Company,* 332 F.3d 513, 516 (8th Cir. 2003) (when a garnishment order is appealed "[w]e review the district court's findings of fact for clear error and the court's conclusions of law de novo.").

**ORDER OF GARNISHMENT**

In a garnishment proceeding, a valid judgment against the judgment debtor (in this case, Keith Sloan) is a necessary essential to the validity of a judgment against the garnishee. *See Morton v. United States,* 708 F.2d 680, 686 n.5 (Fed. Cir. 1983), *rev'd on other grounds*, 467 U.S. 822 (1984); *see also Passarella v. Hilton Int'l Co.,* 810 F.2d 674, 677 (7th Cir. 1987); *In re Wey,* 66 B.R. 638, 639-40 (C.D. Ill. 1986). Sloan argues that the judgment entered in the criminal case on January 31, 2002, which contains the restitution provision, is invalid because the restitution order is contrary to law. The defendant points out that he pleaded guilty to a single misdemeanor charge of causing a material misstatement to be made on an application for a residential loan which was to be guaranteed by HUD. In a self-serving statement that is without a logical, much less a legal, basis or support in precedent, Sloan now contends that in the plea agreement he did not admit to involvement in the overall scheme to defraud as charged in the indictment. Yet, at the sentencing hearing, all the parties agreed on the record that, based on the relevant conduct described in the plea agreement (the overall scheme to defraud), Sloan is jointly and severally liable with the other defendants for restitution in the amount of $638,396.41.[16] Sloan also complains that the properties to which this loss was attributed were not even listed in the plea agreement.

The defendant contends that he did not plead guilty to participating in the overall scheme to defraud; he did

---

[16] Sloan's Presentence Report states that: "The government contends that the offense to which the defendant pled guilty, including relevant conduct, is an offense against property, and thus, an order of restitution is required, pursuant to 18 U.S.C. § 3663A." Sloan agreed and did not contest the government's position at that time.

state that he stipulated to relevant fraudulent conduct which included the overall multi-defendant scheme to defraud as well as his role in the scheme as charged in the original indictment. Paragraph six of the plea agreement specifically recites that the "defendant acknowledges that, as a matter of law, he came to act with intent to defraud in his conduct as a paralegal for Voltl in the Parr flip transactions." In addition, even though the preface to the plea agreement states that: "This Plea Agreement concerns criminal liability only," it also clearly states that: "*nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies*" (emphasis supplied).

We are cognizant of the language in *United States v. Randle* which recites that: "Federal courts possess no inherent authority to order restitution, and may do so only as explicitly empowered by statute." *United States v. Randle,* 324 F.3d 550, 555 (7th Cir. 2003). There must be a "direct nexus between the offense of conviction and the loss being remedied." *Id.* at 556. Only those losses caused by "the specific conduct that is the basis of the offense of conviction" are authorized by statute to be the subject of any order of restitution. *Hughey v. United States,* 495 U.S. 411, 413 (1990).

We have reviewed the defendant Sloan's arguments in their entirety, including his arguments in his brief, and reject each of them in light of Section 3663A(a)(3) of Title 18 of the United States Code, which specifically permits the defendant to undertake additional restitution obligations via a plea agreement. Sloan's plea agreement, which he read, approved and signed, as pointed out heretofore*, clearly sets forth that he understood that the "offense to which he is pleading guilty carries a maximum penalty of one year imprisonment, a one-year term of supervised*

*release, a fine of $100,000, as well as any restitution [in the amount of $638,396.47] ordered by the Court.*" Plea Agreement ¶ 6 (emphasis supplied). Sloan, in a self-serving declaration, somehow casts aside and forgets that the government became a party to the plea agreement *only* after he had personally stipulated in writing and again orally in open court and on the record that he be held jointly and severally liable for the amount of restitution ($638,396.47).

The government argues that, even if the parties to Sloan's plea agreement might conceivably have made a mutual mistake of law in not realizing that the restitution to which they agreed was not mandatory and that it was not tied to the offense of conviction, the government has continuously argued and points out now that the plea document implicitly contained "an agreement to pay restitution beyond the offense of conviction." From a reading of this record in its entirety, it is very clear that the payment of restitution was the central theme and focus of the parties' bargain. *Cf. United States v. Fariduddin,* 469 F.3d 1111, 1113 (7th Cir. 2006) (". . . it was in part by promising to make full and immediate restitution that Fariduddin obtained a reduction in his prison term."). To quote Mr. Justice Holmes, "*there is no canon against using common sense in construing [plea agreements] as saying what they obviously mean.*" *Roschen v. Ward,* 279 U.S. 337, 339 (1929), *quoted in Moore v. Marketplace Restaurant, Inc.,* 754 F.2d 1336, 1346 (7th Cir. 1985) (emphasis supplied). The parties knowingly and voluntarily agreed to the order of restitution.[17]

---

[17] In the plea agreement, the parties agreed "that the conduct which forms the basis for the charge in the instant case to which the defendant is pleading guilty caused a net loss of approximately $641,183.69 less any amounts recovered by the

(continued...)

Sloan, in the original language set forth in the indictment, was charged with three felony offenses. In exchange for the offer on the part of the government for a reduction from three felonies to one misdemeanor, Sloan agreed in writing and on *the record in open court to cooperate and to be adjudged jointly and severally liable for $638,396.41 in restitution. Furthermore, he also clearly waived his right to appeal the sentence, including the amount of restitution (unless he could claim that his attorney's ineffective assistance of counsel rendered the plea involuntary) or to attack the judgment in a collateral proceeding.* We are aware that he was to "reserve the right to contest the entry of the order of restitution." If he was contesting the entry of the restitution order, Sloan or his counsel could have and should have raised an objection at the sentencing hearing prior to entry of the criminal judgment, but that contention is not set forth in a proper manner in his meritless appeal. Furthermore, and most telling, the district judge specifically stated that: "*I am going to waive the fine because of the restitution required.*" Plea Hearing Transcript at 15 (emphasis supplied).

When considered in their entirety, these provisions make it most clear and obvious that the parties were referring to nothing but the order of restitution in the amount of $638,396.41. This was the basis for their bargain. It is a common sense interpretation of the plea bargain and sentence. The error of law claimed here is not jurisdictional and, furthermore, it is not plainly prejudicial to Sloan, who appears to believe that he can enjoy the benefits of his plea agreement, which, after all, reduced three felonies to a misdemeanor in addition to

---

[17] (...continued)
Lender after sale of the property following the respective foreclosures." Plea Agreement ¶ 17.

leaving him eligible to become a licensed attorney in Illinois. On the other hand, if this action is to be remanded to the district court and should the restitution portion be invalidated in any way, the entire plea agreement would, in all probability, be voided and set aside on proper motion on the part of the government. *See United States v. Peterson,* 268 F.3d 533, 534 (7th Cir. 2001). Sloan would once again more properly face three felony counts and a possible prison sentence in addition to the restitution imposed.

In sum, Sloan entered into an agreement freely and voluntarily to pay restitution. He is bound to make the payments. If his intention was not to make the payments, he should not have entered into the agreement. He has entered into a plea bargain from which he has already received the benefit of not incurring felony convictions and now he refuses to carry out and fulfill his legal requirement to pay. Instead, Sloan is asking the court to excuse him from performing that part of the voluntary plea agreement which he feels was disadvantageous to him without interfering with the benefits he has already received.

Sloan's arguments fail and submerge into a quagmire of quicksand, for at no time during the long and tedious proceedings did he challenge the legality of the restitution nor the computation of the amount at the sentencing hearing. Furthermore, as we have pointed out before, he also failed to file a motion within the seven day limit to seek relief pursuant to Federal Rule of Criminal Procedure 35. With no timely appeal, the judgment of conviction with its restitution provision became final in 2002. During the garnishment proceedings in 2005, the district judge concluded that it was too late for Sloan to challenge the restitution order. We agree. Moreover, we hold that the district court had jurisdiction to enter the order. We refuse to vacate and set aside the order of garnishment.

## *CORAM NOBIS*

Additionally, Sloan, as part of his buckshot approach, asks this court to treat his submission to the district court in the garnishment proceedings as a petition for a writ of error *coram nobis.*[18] The Supreme Court considers it "difficult to conceive of a situation in a federal criminal case today where [a writ of *coram nobis*] would be necessary or appropriate." *Carlisle v. United States,* 517 U.S. 416, 429 (1996). To the extent that the writ of *coram nobis* retains vitality in criminal proceedings, such relief is limited to (1) errors "of the most fundamental character" that render the proceeding invalid, (2) situations where there are sound reasons for the failure to seek earlier relief, and (3) instances when the defendant continues to suffer from his conviction even though he is out of custody. *United States v. Morgan*, 346 U.S. 502, 509 n.15, 511-12 (1954). *See also Barnickel v. United States,* 113 F.3d 704, 705-06 (7th Cir. 1997).

In Sloan's case, the error complained of is not of the "most fundamental character" or one that amounts to a miscarriage of justice. Restitution orders that sweep too much conduct into their calculations are issues that must be raised on direct appeal and do not rise to the level of a constitutional violation. *See Barnickel*, 113 F.3d at 706. Moreover, the defendant has not set forth any

---

[18] Sloan also seeks relief under Federal Rule of Civil Procedure 60(b)(4) on the ground that the restitution order contained in his judgment of conviction was entered without jurisdiction and is void. Even if a judgment may come to be partially predicated on an inapplicable law (as Sloan is claiming), this occurrence does not divest a court of jurisdiction over the subject matter or over the parties to an action. Because Sloan's judgment of conviction was properly entered with jurisdiction, this court sees no reason to consider remanding this case to allow the district court to consider granting relief pursuant to Rule 60.

valid or logical reasoning much less case law for his failure to seek relief earlier. As related above, Sloan neither objected at the sentencing hearing nor sought relief under Federal Rule of Criminal Procedure 35. The record is barren of any explanation for these omissions.

The third requirement is that the defendant must demonstrate a lingering civil disability from his alleged wrongful sentence. Civil disability has three elements: (1) the disability must be causing a present harm; (2) the disability must arise out of the erroneous sentence; and (3) the potential harm to the petitioner must be more than incidental. *See United States v. Craig,* 907 F.2d 653, 658 (7th Cir. 1990). Sloan somehow fallaciously reasons that he is prejudiced because he does not want to pay the $638,396.47 in restitution that he voluntarily agreed to pay. He now contends that the restitution order is a present harm that arises out of the criminal conviction. However, an order of restitution is no different than an award of damages in civil litigation. "It is a sunk cost[19] rather than a continuing disability producing additional injury as time passes." *United States v. Keane,* 852 F.2d 199, 204 (7th Cir. 1988), *cert. denied,* 490 U.S. 1084 (1989). Moreover, the payment of $638,396.47 is the very essence and heart of the negotiated plea agreement between the government and the defendant which he willingly and knowingly entered into.[20] Thus, Sloan's financial injury

---

[19] A "sunk cost" is a cost actually incurred which cannot be recovered regardless of future events. *Sunk Cost, at* http://www.investorwords.com/4813/sunk_cost.html (last visited March 19, 2007).

[20] The government points out that this amount will not be satisfied through garnishment of Sloan's wages at the rate of $148 per week (twenty-five percent of his disposable income at the time of sentencing). The government states that: "Over the remaining 16-year life of the judgment, the total collected will be

(continued...)

cannot be classified as the sort of civil disability that can support the issuance of the writ of *coram nobis. See United States v. Bush,* 888 F.2d 1145, 1148 (7th Cir. 1989).

As this court has observed:

> The reason to bend the usual rules of finality is missing when liberty is not at stake. Courts must conserve their scarce time to resolve the claims of those who have yet to receive their *first* decision.

*Keane,* 852 F.2d at 203 (emphasis supplied). For these reasons, the district court need not address Sloan's request in the nature of a writ of error *coram nobis.*

## CONCLUSION

We affirm the district court's order of garnishment and its refusal to consider the purported petition in the nature of a writ of error coram nobis. *Furthermore, we direct the clerk of this court to forward a copy of this opinion to the Attorney Registration and Disciplinary Commission of Illinois. Although Illinois admitted Sloan to its bar in 2005, presumably with full knowledge of his conviction, the state's decision may well have been influenced by the appearance that as of that date Sloan had accepted respon-*

---

[20] (...continued)
less than $125,000. 18 U.S.C. § 3613(b) (judgment expires 20 years from entry)." Brief and Appendix of the United States at 13 n.4. On the other hand, the judgment could be satisfied before the twenty years is up because Sloan will get credit for payments made by his ten jointly and severally liable co-defendants or he could get a salary increase and make larger payments. This court realizes that the order of garnishment and its amount of restitution may be renewed for another twenty years if a motion is made before the expiration of the present order of garnishment. *See* 28 U.S.C. § 3201(c).

*sibility and was making amends, which he has not. These proceedings clearly demonstrate that Sloan has not kept that promise and is doing what he can to shirk his respon-sibility; this calls into question his character and fitness for membership in the bar.*

A true Copy:

   Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*