# United States Court of Appeals
## For the First Circuit

No. 11-1815

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD J. GEORGE,

Petitioner, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Boudin, Selya and Stahl,
Circuit Judges.

Bruce T. Macdonald for appellant.
S. Theodore Merritt, Assistant United States Attorney, with
whom Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

April 17, 2012

**SELYA**, **Circuit Judge**.  A Hail Mary pass in American football is a long forward pass made in desperation at the end of a game, with only a small chance of success.  The writ of error coram nobis is its criminal-law equivalent.  This appeal requires us to explore the intricacies of the writ, sift through the considerations that inform a determination to unleash that extraordinary remedy, and assess the extent to which discretion can influence a reviewing court's decision about coram nobis relief.  We conclude that a flexible, common-sense approach to coram nobis relief is warranted and that, in the last analysis, we have discretion to withhold the remedy where the interests of justice so dictate.  Applying this principle to the case at hand, we affirm the district court's denial of the writ.

## I.  BACKGROUND

From 1975 to 1995, petitioner-appellant Richard George served as a first assistant clerk-magistrate of a Massachusetts state court.  In that capacity, he performed an array of administrative tasks central to the court's operation, including the issuance of search warrants.

In December of 1995, the government filed a one-count information charging the petitioner with participation in a conspiracy to commit honest-services wire fraud.  See 18 U.S.C. §§ 371, 1343, 1346.  The information averred that the petitioner had conspired to "participate in a scheme to defraud the

Commonwealth of Massachusetts of the intangible right of [his] honest services . . ., and to cause the use of wire communications in execution of this scheme." In support, the information stated that the petitioner surreptitiously delivered blank search warrants to one Michael Fosher, knowing that Fosher had no legitimate use for them. Wire fraud came into play because Fosher had made at least one interstate telephone call to the petitioner in furtherance of the scheme.

The petitioner waived indictment, and the parties immediately entered into a binding C-type plea agreement. See Fed. R. Crim. P. 11(c)(1)(C). The agreement contemplated that the petitioner would plead guilty to the information and that his sentence would entail twenty months of imprisonment, a $10,000 fine, the standard $50 special assessment, and two years of supervised release.

The recitals contained in the plea agreement and presentence investigation report shed further light on the underlying events. Those recitals made pellucid that Fosher and several confederates had used the improperly obtained search warrants to mount a series of robberies. For example, they would pose as law enforcement officers executing a warrant, enter a drug dealer's home, and abscond with his drugs and money. By the time that the petitioner signed the plea agreement, nearly all of the

other miscreants involved in the scheme had pleaded guilty to federal charges.

The district court accepted the plea and sentenced the petitioner in accordance with the plea agreement. The petitioner did not appeal, nor did he at any time seek habeas relief. See 28 U.S.C. § 2255. Rather, he served his incarcerative term, paid the fine and special assessment, and completed two years of supervised release on April 23, 1999.

The petitioner retired from state service prior to the entry of his guilty plea, and on October 1, 1995, he began receiving a monthly retirement stipend of $1,424.91, together with lifetime health-care coverage. Those benefits continued throughout his immurement and beyond. But in January of 2003, the state retirement board (the Board) suspended his retirement benefits due to his federal conviction. This decision was especially disconcerting to the petitioner because the anticipated flow of retirement benefits had been part and parcel of his plea bargain strategy; his attorney had advised him that he would remain eligible for his vested retirement benefits as long as he started receiving them before he entered a guilty plea.

On October 29, 2004, the petitioner filed his first petition for a writ of error coram nobis. He argued that his conviction suffered from a fundamental defect in that the government had failed to allege facts establishing all the elements

of the offense of conviction. The district court denied the petition, finding no fundamental defect in the conviction. United States v. George, 436 F. Supp. 2d 274, 277-79 (D. Mass. 2006). On May 11, 2007, we summarily affirmed that ruling. See United States v. George, No. 06-2010 (1st Cir. May 11, 2007) (unpublished). Shortly thereafter, the Board permanently revoked the petitioner's pension and authorized the institution of proceedings to recoup benefits paid in excess of the petitioner's aggregate contributions to the retirement system.[1]

In 2010, the Supreme Court truncated the reach of the statute proscribing honest-services fraud. See Skilling v. United States, 130 S. Ct. 2896, 2928-34 (2010). The Court held that the "intangible right of honest services," set out in 18 U.S.C. § 1346, would be unconstitutionally vague unless it was limited to schemes to defraud that involve bribes or kickbacks. Id. at 2933-34. Because the government had failed to show that Skilling had engaged in conduct involving bribery or kickbacks, the Court determined that he "did not commit honest-services fraud." Id. at 2934.

As said, the petitioner had pleaded guilty to an information that charged conspiracy to commit honest-services wire fraud. The information did not contain any mention of bribes or

---

[1] At the time of his retirement, the petitioner had $65,521.56 in his retirement account. By the time that the Board halted pension payments, the Commonwealth had paid him $114,503.25. The record is silent as to the efficacy of any recoupment efforts.

kickbacks.  The petitioner seized on the Skilling decision and filed his second petition for a writ of error coram nobis.  In this petition, he insisted that, under Skilling, there was a fundamental error in his conviction.

The district court denied the petition.  United States v. George, No. 95-10355, 2011 WL 2632321, at *4 (D. Mass. June 30, 2011).  It analyzed the petitioner's claim through the prism of a tripartite test requiring a petitioner to "1) explain h[is] failure to seek relief from judgment earlier, 2) demonstrate continuing collateral consequences from the conviction, and 3) prove that the error is fundamental to the validity of the judgment."  United States v. Sawyer, 239 F.3d 31, 38 (1st Cir. 2001).  The court found the timeliness requirement satisfied and agreed with the petitioner that, in light of Skilling, a fundamental error had occurred.  See George, 2011 WL 2632321, at *2.  Nevertheless, the court determined that the cessation of the petitioner's retirement benefits did not constitute a continuing collateral consequence sufficient to justify the extraordinary remedy sought.  Id. at *2-3 (citing United States v. Craig, 907 F.2d 653, 660 (7th Cir. 1990)).  Consequently, it denied coram nobis relief.  This timely appeal followed.

## II.  ANALYSIS

This appeal requires us to revisit the tripartite test that we have used in the past for coram nobis cases.  We start by explicating the applicable law and then proceed to the merits.

### A.  <u>The Legal Landscape</u>.

The writ of error coram nobis is of ancient lineage, tracing its roots to sixteenth century English common law.  <u>See</u> <u>Sawyer</u>, 239 F.3d at 37.  Its original purpose was to promote respect for the judicial process by enabling a court to correct technical errors in a final judgment previously rendered.  <u>See</u> <u>United States</u> v. <u>Denedo</u>, 129 S. Ct. 2213, 2220 (2009).  In the United States, the office of the writ has expanded well beyond the reopening of a final judgment to correct technical errors.  <u>See</u> <u>id.</u> In federal criminal cases, the writ is now available as a remedy of last resort for the correction of fundamental errors of fact or law.  <u>Trenkler</u> v. <u>United States</u>, 536 F.3d 85, 93 (1st Cir. 2008).

The authority to grant coram nobis relief derives from the All Writs Act, 28 U.S.C. § 1651(a), which empowers federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  There is a generally accepted understanding that the All Writs Act imbues courts with flexible, <u>see</u> <u>Sprint Spectrum L.P.</u> v. <u>Mills</u>, 283 F.3d 404, 413 (2d Cir. 2002), inherently equitable, <u>see</u> <u>Clinton</u> v. <u>Goldsmith</u>, 526 U.S. 529, 537 (1999), powers.  These

powers are anchored in informed judicial discretion. See Roche v. Evap'd Milk Ass'n, 319 U.S. 21, 25-26 (1943); In re Cargill, Inc., 66 F.3d 1256, 1260 (1st Cir. 1995); Paramount Film Distrib. Corp. v. Civic Ctr. Theatre, Inc., 333 F.2d 358, 360 (10th Cir. 1964). An emphasis on restraint is ingrained: the extraordinary nature of the writs implies that they should be issued sparingly. See In re Cargill, 66 F.3d at 1259; In re Sch. Asbestos Litig., 977 F.2d 764, 772 (3d Cir. 1992).

The metes and bounds of the writ of coram nobis are poorly defined and the Supreme Court has not developed an easily readable roadmap for its issuance. See Denedo, 129 S. Ct. at 2220. But the Court has indicated that caution is advisable and that "[c]ontinuation of litigation after final judgment . . . should be allowed through this extraordinary remedy only under circumstances compelling such action to achieve justice." United States v. Morgan, 346 U.S. 502, 511 (1954). This emphasis on the interests of justice is entirely consistent with the provenance and usage of extraordinary writs generally. See, e.g., Bracy v. Gramley, 520 U.S. 899, 904 (1997); Burr & Forman v. Blair, 470 F.3d 1019, 1026 (11th Cir. 2006); Hartley Pen Co. v. U.S. Dist. Court, 287 F.2d 324, 328 (9th Cir. 1961).

The Supreme Court has always envisioned coram nobis as strong medicine, not profligately to be dispensed. On the few occasions post-Morgan that the Court has commented on coram nobis,

the Justices have stressed that there will rarely be situations warranting the deployment of the writ. See, e.g., Denedo, 129 S. Ct. at 2220 (remarking on the importance of limiting the writ to truly extraordinary circumstances "so that finality is not at risk in a great number of cases"); Carlisle v. United States, 517 U.S. 416, 429 (1996) (noting that "it is difficult to conceive of a situation in a federal criminal case today where a writ of coram nobis would be necessary or appropriate" (alterations and internal quotation marks omitted)).

Given the Court's evident concerns, it is not surprising that successful petitions for coram nobis are hen's-teeth rare. Consequently, the courts of appeals have not yet developed anything resembling a uniform approach to such relief.

In this circuit, we have formulated a tripartite test to help guide our decisionmaking. Under it, a coram nobis petitioner must explain his failure to seek earlier relief from the judgment, show that he continues to suffer significant collateral consequences from the judgment, and demonstrate that the judgment resulted from an error of the most fundamental character. See United States v. Barrett, 178 F.3d 34, 56 n.20 (1st Cir. 1999); Hager v. United States, 993 F.2d 4, 5 (1st Cir. 1993) (Breyer, C.J.). Other courts of appeals have enumerated comparable requirements. See, e.g., United States v. Sloan, 505 F.3d 685, 697 (7th Cir. 2007); United States v. Mandanici, 205 F.3d 519, 524 (2d

Cir. 2000); <u>United States</u> v. <u>Walgren</u>, 885 F.2d 1417, 1420 (9th Cir. 1989).

Beyond these generalities, the case law has been uneven. For example, several courts have indicated that something more than the stain of conviction is needed to show continuing collateral consequences. <u>See</u>, <u>e.g.</u>, <u>Fleming</u> v. <u>United States</u>, 146 F.3d 88, 90-91 & n.3 (2d Cir. 1998) (per curiam); <u>United States</u> v. <u>Dyer</u>, 136 F.3d 417, 429-30 & n.33 (5th Cir. 1998); <u>Hager</u>, 993 F.2d at 5; <u>United States</u> v. <u>Osser</u>, 864 F.2d 1056, 1059-60 (3d Cir. 1988); <u>see also</u> <u>United States</u> v. <u>Keane</u>, 852 F.2d 199, 203 (7th Cir. 1988) (holding that continuing collateral consequences arise only in situations where the disability is unique to a criminal conviction). Other courts have indicated that continuing collateral consequences invariably flow from a felony conviction alone. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Peter</u>, 310 F.3d 709, 715-16 (11th Cir. 2002) (per curiam); <u>Walgren</u>, 885 F.2d at 1421; <u>United States</u> v. <u>Mandel</u>, 862 F.2d 1067, 1075 & n.12 (4th Cir. 1988). Yet another court has granted coram nobis relief without mentioning the requirement. <u>See</u> <u>Allen</u> v. <u>United States</u>, 867 F.2d 969, 971-72 (6th Cir. 1989).

The dispute over the collateral consequences requirement is emblematic of a more general lack of jurisprudential uniformity. For instance, the courts of appeals typically place varying levels of emphasis on other factors. When it is alleged that a federal

-10-

criminal statute does not reach certain conduct, some courts focus narrowly on whether the record still sets out a crime, see, e.g., Peter, 310 F.3d at 711-16; Allen, 867 F.2d at 971-72, whereas other courts focus on a wider universe, including whether the petitioner had exhausted his rights to appeal, see, e.g., Osser, 864 F.2d at 1060-62; United States v. Travers, 514 F.2d 1171, 1176-79 (2d Cir. 1974) (Friendly, J.), and the interest of finality, see, e.g., Craig, 907 F.2d at 658; Osser, 864 F.2d at 1059.

Despite the myriad approaches that courts have taken, we think there is a bellwether principle: "each attempted use of an extraordinary writ in connection with post-conviction relief must be judged on its own merits." Trenkler, 536 F.3d at 97. This is especially true of coram nobis. A case-by-case approach is preferable, with each decision about whether to grant or deny the writ ultimately residing in the court's sound discretion. It follows that the tripartite test should not be administered mechanically but, rather, in a flexible, common-sense manner. Even if the test is satisfied, the court retains discretion over the ultimate decision to grant or deny the writ. In other words, passing the tripartite test is a necessary, but not a sufficient, condition for the issuance of the writ. Additional circumstances, not readily susceptible to facile categorization, may provide adequate reason for a court, in the exercise of its discretion, to

stay its hand.  See In re Cargill, 66 F.3d at 1260; In re Sch. Asbestos Litig., 977 F.2d at 772.

The bottom line is that a writ of error coram nobis should issue "only under circumstances compelling such action to achieve justice."  Morgan, 346 U.S. at 511.  The devoir of persuasion is on the petitioner: if he fails to convince the court that the ends of justice will be served by granting such extraordinary relief, the court may refrain from upsetting a conviction that has long since become final.

Our emphasis on discretion treads a well-worn path.  In its seminal coram nobis decision the Supreme Court noted that the writ may issue to correct factual errors only in "those cases where the errors were of the most fundamental character; that is, such as rendered the proceeding itself irregular or invalid."  United States v. Mayer, 235 U.S. 55, 69 (1914).  The Morgan Court reiterated this standard and added the caveat that the writ should issue "only under circumstances compelling such action to achieve justice."  346 U.S. at 511 (emphasis supplied).  Consequently, it is not enough for a coram nobis petitioner to show that he can satisfy the elements of the tripartite test: he must also show that justice demands the extraordinary balm of coram nobis relief.  See Hager, 993 F.2d at 5 (explaining that courts will use the writ of error coram nobis "to set aside a criminal judgment only under circumstances compelling such action to achieve justice" (internal

quotation marks omitted)); see also Barrett, 178 F.3d at 56 n.20;

Foont v. United States, 93 F.3d 76, 79 (2d Cir. 1996).

## B. **The Merits**.

Against this backdrop we turn to the merits. The court below rested its denial of the writ on a finding that the petitioner failed to show sufficient continuing collateral consequences stemming from his conviction. See George, 2011 WL 2632321, at *2-3.

The petitioner's most aggressive attack on this finding is that the continuing collateral consequences requirement is not a requirement at all. In his view, the insistence on such a showing results from a misreading of the Supreme Court's opinion in Morgan. He insists that we should find the stain of a felony conviction itself sufficient to supplant any need for a further showing of continuing collateral consequences.

It is settled law in this circuit that the continuing collateral consequences requirement is part of the analytic framework that pertains in coram nobis cases. See, e.g., Sawyer, 239 F.3d at 38; Hager, 993 F.2d at 5. Although we have not explicitly set out what comprises a continuing collateral consequence, we have clearly indicated that a conviction alone is not enough. See Hager, 993 F.2d at 5.[2] The petitioner's

---

[2] In United States v. Michaud, 925 F.2d 37, 39 n.1 (1st Cir. 1991), we declined to address this point. Instead, we noted that a contempt citation entered against the petitioner "for failure to

-13-

invitation that we scuttle this requirement runs contrary to the well-settled tenet that newly constituted panels in a multi-panel circuit are, with isthmian exceptions not pertinent here, bound by prior on-point circuit precedent. See San Juan Cable LLC v. P.R. Tel. Co., 612 F.3d 25, 33 (1st Cir. 2010); United States v. Wogan, 938 F.2d 1446, 1449 (1st Cir. 1991). We therefore decline the petitioner's invitation.

The petitioner's next argument is that the loss of his monthly pension benefits should be considered a continuing collateral consequence. We need not grapple with this argument. Even assuming arguendo that the continuing collateral consequences requirement has been satisfied,[3] he nonetheless has failed to

---

pay a $60,000 fine levied as part of his sentence" would satisfy any continuing collateral consequences requirement. Id. Nevertheless, our statement two years later in Hager, 993 F.2d at 5, that the appellant has not "shown significant, continuing collateral consequences flowing from his conviction," plainly indicates that more than the mere fact of a conviction is required.

[3] The answer to this question is not clear. The petitioner's ongoing loss of monthly pension benefits, together with health-care coverage, may satisfy one piece of the continuing collateral consequences requirement, see Osser, 864 F.2d at 1060 (assuming that loss of pension benefits is a continuing collateral consequence), but such a conclusion is not foregone, see Craig, 907 F.2d at 660 (holding that "removal from [a] pension plan is a sunk cost, much like a criminal fine"). In all events, there is a second piece of the continuing collateral consequences requirement: it must be shown that the court's decree will eliminate the claimed collateral consequence and bring about the relief sought. See United States v. Bush, 888 F.2d 1145, 1149 (7th Cir. 1989). The record here offers no compelling reason to believe that vacating the petitioner's conviction would automatically restore his retirement benefits.

persuade us that the circumstances of his case demand coram nobis relief. We elaborate below.

At the outset, we pause to clarify the standard of review. In coram nobis cases, we afford de novo review to the district court's legal conclusions and clear-error review to its findings of fact. Sawyer, 239 F.3d at 36. The court below did not conduct an evidentiary hearing and denied the writ as a matter of law. Thus, our review here is plenary.

In this court, the government does not challenge the district court's assumption that a fundamental error occurred. This tacit concession poses no barrier to our full consideration of this issue. See United States v. Borrero-Acevedo, 533 F.3d 11, 15 n.3 (1st Cir. 2008) (explaining that "[t]his court is not bound by [the government's] concessions" in a criminal case). Our inquiry into the fundamental error requirement therefore reduces to whether the petitioner has demonstrated "an error of 'the most fundamental character.'" Hager, 993 F.2d at 5 (quoting Morgan, 346 U.S. at 512).

The petitioner's conviction resulted from a guilty plea. Undeniable advantages, such as limiting exposure to punishment, flowed from this decision. The flip side is that (with limited exceptions not applicable here) the unconditional guilty plea waived virtually all objections and defenses for purposes of direct appeal. See United States v. González-Mercado, 402 F.3d 294, 298

(1st Cir. 2005); United States v. González, 311 F.3d 440, 442 (1st Cir. 2002). The petitioner could have challenged the legal definition of honest-services fraud then and there but waived that right by opting instead to enter into a plea bargain. This decision alone counts against finding an error of the most fundamental character. Cf. Osser, 864 F.2d at 1060-62 (stating that the appellant could not raise in his coram nobis petition an argument that he failed to raise on direct appeal); Travers, 514 F.2d at 1177 (Friendly, J.) (limiting its decision to grant coram nobis relief "to defendants who . . . had gone through the full appellate process").

The interest of finality, always important in criminal cases, is of heightened concern when a conviction arises from a guilty plea. See Bousley v. United States, 523 U.S. 614, 621 (1998); Blackledge v. Allison, 431 U.S. 63, 71-72 (1977). While constitutional questions about whether the plea was knowing and intelligent may be susceptible to review, see United States v. Jimenez, 512 F.3d 1, 3-4 (1st Cir. 2007); United States v. Gandia-Maysonet, 227 F.3d 1, 3 (1st Cir. 2000), even those questions, if not raised below, are subject only to plain-error review. See Jimenez, 512 F.3d at 3-4. Such review is largely a matter of discretion. See United States v. Olano, 507 U.S. 725, 735-36 (1993); United States v. Kinsella, 622 F.3d 75, 83 (1st Cir. 2010).

The limitations on collateral attacks of guilty pleas are even greater. See Bousley, 523 U.S. at 621-24. These limitations are most familiarly associated with attempts to secure habeas corpus relief. When a defendant seeks to vacate a guilty-plea conviction by way of coram nobis, great caution is warranted. Because custody no longer attaches and liberty is no longer at stake, an inquiring court should pay particular attention to whether there is "some . . . basis for thinking that the defendant is at least arguably guilty." Gandia-Maysonet, 227 F.3d at 6.

In response to the petitioner's original coram nobis petition, the district court plausibly determined that a factual basis existed for the conspiracy conviction. George, 436 F. Supp. 2d at 277-79. The petitioner now resurrects this same argument in light of Skilling, contending that he stands convicted of an offense that is not criminal. But Skilling did not invalidate the definition limned in 18 U.S.C. § 1346 ("[T]he term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."); it merely clarified that prosecutions under statutes incorporating that definition require evidence of bribes or kickbacks. 130 S. Ct. at 2933-34.

Viewed from this perspective, the petitioner's argument is very narrow. He does not say that no bribes or kickbacks occurred; he merely says that the record before us contains no such

-17-

evidence.  He does nothing to dispel the obvious concern that the conspiracy in which he was involved may have entailed conduct still criminal under Skilling.

This narrow argument overlooks the reality that the factual insufficiency about which the petitioner complains may well have resulted from his own decision to minimize his exposure and plead guilty as soon as practicable.  Had he put the government to its burden at trial, a substantially more robust factual record would doubtless have been developed.  Having secured a plea, it may well have been the best use of the government's finite prosecutorial resources to put limited effort into establishing anything more than the bare elements of the plea-bargained crime. This is even more probable because the petitioner's prosecution came after most of the other coconspirators had entered guilty pleas.

To be sure, the record in this case contains no direct evidence of bribes.[4]  At most, however, the question of whether or not bribes took place remains unresolved.  The record makes manifest that the petitioner passed out search warrants like popsicles in July to a person whom he knew had no legitimate use for them.  Common sense strongly suggests that the petitioner — who risked his reputation, his job, and his liberty by conspiring with

---

[4] Although we acknowledge that Skilling requires either bribes or kickbacks, for ease in exposition we limit our subsequent discussion to bribes.

-18-

Fosher — must have received some sort of emolument to make his trouble worthwhile. The law does not require a court to blind itself to the obvious, and it would be tooth-fairy odd for the petitioner to have handed out blank warrants in the absence of a quid pro quo. In these uncertain circumstances, a Skilling error cannot readily be classified as an error of the most fundamental character.

Words have meaning, and an error "of the most fundamental character," Morgan, 346 U.S. at 512 (internal quotation marks omitted), must denote something more than an error simpliciter. At the very least, the error must be more than a factual insufficiency that the petitioner's voluntary decisions may have caused.

Such reasoning has special force where, as here, a challenger is asking us to defenestrate a judgment that became final long ago. See Denedo, 129 S. Ct. at 2223 (explaining that "judgment finality is not to be lightly cast aside; and courts must be cautious so that the extraordinary remedy of coram nobis issues only in extreme cases"); Trenkler, 536 F.3d at 100 (similar). The further a case progresses through the remedial steps available to a criminal defendant, the stiffer the requirements for vacating a final judgment. Thus, direct review is more defendant-friendly than post-judgment review, see United States v. Frady, 456 U.S. 152, 165-66 (1982), and an initial habeas petition is easier for a criminal defendant to litigate than a successive one, see Trenkler,

536 F.3d at 100. The writ of error coram nobis lies at the far end of this continuum. Logically, then, when a defendant seeks to vacate a guilty-plea conviction by way of coram nobis, red flags accompany that request. Cf. Denedo, 129 S. Ct. at 2220 (admonishing that coram nobis relief should be cabined "so that finality is not a risk in a great number of cases").

This brings the matter of our discretion front and center. The petitioner here has not persuaded us that the circumstances of this case warrant an affirmative exercise of that discretion. The petitioner's strategic decisions (his waiver of indictment, his immediate entry into a plea agreement, and his eschewal of both direct review and habeas review) have stifled the development of a full record, and common sense argues powerfully that culpable conduct likely took place. The petitioner has made the narrowest of arguments and has done nothing to dispel this inference.

Each request for a writ of error coram nobis must be judged on its own facts. Even if we assume for argument's sake that the petitioner has satisfied the tripartite test, we know of no binding authority that would compel us, when making an essentially equitable determination regarding the appropriateness of extraordinary relief, to grant coram nobis. When all is said and done, issuing or denying a writ of error coram nobis must hinge on what is most compatible with the interests of justice, see id.;

<u>Morgan</u>, 346 U.S. at 511, and our discretion must be guided by that inquiry.

We think that the reasons why we decline to exercise our discretion favorably to the petitioner are apparent. It is difficult to understate either the wrongfulness or the criminal character of what the petitioner himself admits to having done. That conduct comprises a clear violation of his obligations under the oath taken by him as an official of the Massachusetts court system. The conduct — handing over blank warrants for improper purposes on at least two separate occasions — also comprises a brazen and reprehensible misuse of his official authority. It in all likelihood violated a number of state criminal statutes, and it also violated the federal fraud statute as its honest services component was understood at the time (even if one further likely fact — the bribe — was not included in the plea agreement and colloquy because not then deemed necessary). Granting relief in these circumstances would be both a misuse of our authority under the All Writs Act and a perversion of the writ of error coram nobis. In the end, the writ is designed to do justice, not to facilitate a miscarriage of justice.

The petitioner has a fallback position. He strives to convince us that because <u>Skilling</u>, 130 S. Ct. at 2933-34, requires proof of bribes or kickbacks for honest-services fraud, and the information to which he pleaded includes no such allegation, the

-21-

district court was without jurisdiction to accept his plea. We are not persuaded.

Subject matter jurisdiction refers to a court's power, whether constitutional or statutory, to adjudicate a case. United States v. Cotton, 535 U.S. 625, 630 (2002). Congress has given federal district courts original jurisdiction over "all offenses against the laws of the United States." 18 U.S.C. § 3231. Thus, if an indictment or information alleges the violation of a crime set out "in Title 18 or in one of the other statutes defining federal crimes," that is the end of the jurisdictional inquiry. González, 311 F.3d at 442; see Hugi v. United States, 164 F.3d 378, 380 (7th Cir. 1999).

Although jurisdiction in the federal criminal context lends itself to straightforward analysis, courts sometimes have used the term colloquially. Such usages have caused some confusion. See Eberhart v. United States, 546 U.S. 12, 13-19 (2005) (per curiam); Cotton, 535 U.S. at 630-31. Indeed, this "less than meticulous" practice, Eberhart, 546 U.S. at 16, has given the word "jurisdiction" a "chameleon-like quality," Prou v. United States, 199 F.3d 37, 45-46 (1st Cir. 1999).

The case on which the petitioner principally relies in support of his jurisdictional argument is a paradigmatic example of this phenomenon. In United States v. Rosa-Ortiz, 348 F.3d 33, 36 (1st Cir. 2003), we stated that a district court "lacks

jurisdiction to enter a judgment of conviction when the indictment charges no offense under federal law." The petitioner seizes upon this language.

Rosa-Ortiz cannot carry the weight that the petitioner loads upon it. That opinion dealt with an instance in which the indictment was factually insufficient. Id. at 36-42. Supreme Court precedent makes transparently clear that an indictment's factual insufficiency does not deprive a federal court of subject matter jurisdiction. See Cotton, 535 U.S. at 630-31; Lamar v. United States, 240 U.S. 60, 64-65 (1916) (Holmes, J). "[A] district court has jurisdiction of all crimes cognizable under the authority of the United States[,] and the objection that the indictment does not charge a crime against the United States goes only to the merits of the case." Cotton, 535 U.S. at 630-31 (quoting Lamar, 240 U.S. at 65) (alterations and internal quotation marks omitted); accord Vanwinkle v. United States, 645 F.3d 365, 369 (6th Cir. 2011); United States v. Todd, 521 F.3d 891, 894-95 (8th Cir. 2008); United States v. Delgado-Garcia, 374 F.3d 1337, 1341-42 (D.C. Cir. 2004). Viewed in this light, the Rosa-Ortiz court's statement must be regarded as an awkward locution. That locution used the word "jurisdiction" to refer to what the court considered a non-waivable defect, see United States v. Ceballos, 302 F.3d 679, 691-92 (7th Cir. 2002), not to the district court's power to adjudicate the case.

The bottom line is that <u>Skilling</u> has little or nothing to do with the jurisdictional inquiry. The opinion in <u>Skilling</u> merely clarifies that to convict someone of honest-services fraud, a factual showing of bribery or kickbacks is compulsory. While this holding rendered the instant information <u>factually</u> insufficient, <u>see</u> <u>Skilling</u>, 130 S. Ct. at 2933-34, it did not divest the district court of subject matter jurisdiction over the case. <u>See</u> <u>Cotton</u>, 535 U.S. at 631; <u>Lamar</u>, 240 U.S. at 64-65; <u>González-Mercado</u>, 402 F.3d at 300-01.

## III.  CONCLUSION

We need go no further. In a coram nobis case, the ultimate question is whether the circumstances favor granting the writ in order to achieve justice. <u>See</u> <u>Morgan</u>, 346 U.S. at 511. When it appears questionable that an error of the most fundamental character has transpired and it seems dubious that granting the writ will promote the interests of justice, a federal court should decline to exercise its discretion so as to disturb a judgment that has long since become final. So it is here.

**Affirmed**.