# United States Court of Appeals
## For the First Circuit

No. 17-2114

FRANCIS H. WOODWARD,

Petitioner, Appellant,

v.

UNITED STATES,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Selya, and Barron,
Circuit Judges.

Bruce A. Singal, with whom Lauren E. Dwyer and Barrett & Singal were on brief, for appellant.
Sonja M. Ralston, Attorney, Criminal Division, Appellate Section, U.S. Department of Justice, with whom John P. Cronan, Acting Assistant Attorney General, Matthew S. Miner, Deputy Assistant Attorney General, and Jenny C. Ellickson, Attorney, were on brief, for appellee.

September 26, 2018

**TORRUELLA**, **Circuit Judge**.  In 1996, a jury convicted former Massachusetts state representative Francis H. Woodward of, among other crimes, honest-services mail and wire fraud.  He appeals to us from the district court's denial of his most recent petition for a writ of error coram nobis.  We conclude that the district court did not err in denying that petition.

## I.

## A.

Our opinion addressing Woodward's direct appeal from his conviction lays out the underlying facts in considerable detail.  See United States v. Woodward (Woodward I), 149 F.3d 46, 51-54 (1st Cir. 1998).  We provide only a brief recap of those facts here.

Woodward was elected to the Massachusetts House of Representatives in 1977.  Id. at 51.  He served on the Joint Committee on Insurance (the "Committee") from 1985 to 1991.  Id. During that time, William Sawyer served as the senior legislative counsel in the Government Relations Department of John Hancock Mutual Life Insurance Company ("Hancock").  Id.  Sawyer was also an "active participant" in the Life Insurance Association of Massachusetts (LIAM), an industry association -- of which Hancock was a member -- that employed lobbyists "who worked on Massachusetts legislation."  Id.  "From 1984 through 1992, Woodward

-2-

accepted in excess of $9,000 in gratuities from Hancock and LIAM through their lobbyists Sawyer and William F. Carroll, the president of LIAM. Hancock provided the majority of this largesse, at least $8,740 in meals, rounds of golf, and other entertainment." Id. at 52.

While serving on the Committee, "Woodward's official actions, for the most part, conformed with the way Sawyer and Hancock wanted the recipient of their gratuities to conduct himself." Id. at 53. Robert J. Smith, the Committee's research director, testified that Woodward was the "most pro-life-insurance-industry chair of the [Committee] during Smith's tenure." Id. During that time, "Woodward actively supported the industry's position on most bills of importance to the industry." Id. Woodward also neglected his statutory duty to disclose gifts that he or his immediate family received from lobbyists or businesses with a direct interest in legislation. Id. at 62 (citing Mass. Gen. Laws ch. 268B, § 5).

A jury convicted Woodward of one count of honest-services mail fraud, see 18 U.S.C. §§ 1341, 1346, one count of honest-services wire fraud, see 18 U.S.C. §§ 1343, 1346, two counts of interstate travel to commit bribery, see 18 U.S.C. § 1952, and one count of conspiracy to commit those offenses, see 18 U.S.C. § 371. The district court granted a judgment of acquittal on one

count of interstate travel to commit bribery. The district court then sentenced Woodward to six months of community confinement, followed by two years of supervised release, and a $200 special assessment. Woodward appealed from his remaining convictions, and we affirmed. Woodward I, 149 F.3d at 73. In 2002, the Massachusetts State Board of Retirement, invoking Mass. Gen. Laws ch. 32, § 15(4), rescinded Woodward's pension benefits. That statute provides that "[i]n no event shall any member after final conviction of a criminal offense involving violation of the laws applicable to his office or position, be entitled to receive a retirement allowance[.]" Id. The Supreme Judicial Court of Massachusetts upheld the State Board of Retirement's decision to do so. State Bd. of Ret. v. Woodward, 847 N.E.2d 298, 306 (Mass. 2006).

Woodward brought his first collateral attack on his conviction under 28 U.S.C. § 2255, grounding his petition in two then-recently decided cases interpreting the federal and Massachusetts gratuity statutes. See United States v. Sun-Diamond Growers of Cal., 526 U.S. 398 (1999); Scaccia v. State Ethics Comm'n, 727 N.E.2d 824 (Mass. 2000). In response, the district court vacated Woodward's conviction on the conspiracy count and on the remaining count of interstate travel to commit bribery. Woodward's second collateral attack took the form of a writ of

-4-

error coram nobis, arguing that his remaining convictions were invalid in the wake of Skilling v. United States. See 561 U.S. 358 (2010). The district court denied relief. United States v. Woodward (Woodward II), No. 12-11431, 2012 WL 4856055, at *9 (D. Mass. Oct. 10, 2012).

**B.**

This appeal arises from Woodward's third collateral attack -- his second writ of error coram nobis. Woodward's petition relied primarily on the Supreme Court's recent decision in McDonnell v. United States, 136 S. Ct. 2355 (2016). There, the Supreme Court narrowed the definition of "official act" in the honest-services fraud prosecutions before it. Id. at 2371-72. The district court correctly recognized that, to succeed, a coram nobis petitioner must "explain his failure to seek earlier relief from the judgment, show that he continues to suffer significant collateral consequences from the judgment, and demonstrate that the judgment resulted from an error of the most fundamental character." United States v. Woodward (Woodward III), No. 17-12036, 2017 WL 4684000, at *4 (D. Mass. Oct. 18, 2017) (quoting United States v. George, 676 F.3d 249, 254 (1st Cir. 2012)). So too did it acknowledge that even if a petitioner meets those three criteria, "the court retains discretion over the ultimate decision to grant or deny the writ." Id. (quoting George, 676 F.3d at 255).

-5-

The district court then applied these requirements to Woodward's petition.

First, the district court, observing that Woodward had brought his petition approximately six months after the Supreme Court decided McDonnell, held that Woodward had adequately explained his failure to seek earlier relief. Id. at *4. Second, the district observed that "[i]t remains an open question in the First Circuit whether the loss of pension benefits can qualify as a significant collateral consequence." Id. at *5. Nonetheless, it found that "the loss of a pension could constitute a significant collateral consequence and that vacation of Woodward's conviction would likely eliminate the grounds for that consequence," and therefore declined to deny relief on the basis of that prong. Id. at *6. Third, after reviewing the evidence that the government introduced during Woodward's trial and the jury instructions from that trial, the district court found Woodward's conviction to be compatible with McDonnell, and therefore could not amount to an error "of the most fundamental character." Id. at *6-10. Fourth and finally, the district court -- highlighting that Woodward had flouted the state-law requirement that he disclose the gratuities he received -- added that "the interests of justice do not justify the issuance of a writ of coram nobis" to Woodward. Id. at *10. Woodward has appealed this decision to us.

-6-

**II.**

Woodward argues that, contrary to what the district court concluded, his convictions for honest-services mail and wire fraud now amount to fundamental legal error in light of McDonnell.

Both the federal mail and wire fraud statutes require, among other things, that the defendant have executed a "scheme or artifice to defraud." 18 U.S.C. §§ 1341, 1343. 18 U.S.C. § 1346, in turn, provides that "the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." This includes depriving "the public of its right to the honest services of its legislators." Woodward I, 149 F.3d at 55. In McDonnell, the parties "agreed that they would define honest services fraud with reference to the federal bribery statute, 18 U.S.C. § 201." 136 S. Ct. at 2365. It is implicit in the parties' arguments here that we should do the same. The federal bribery statute imposes criminal liability on any "public official" who "corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value . . . in return for . . . being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2)(A). It defines "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such

official's official capacity, or in such official's place of trust or profit." Id. § 201(a)(3).

McDonnell turned on whether the defendant, the former governor of Virginia, had performed "official acts" within this definition in exchange for various loans and gifts he had received from the CEO of a Virginia-based company. 136 S. Ct. at 2362, 2365. The Supreme Court rejected the government's argument for a broad definition of that term -- which, according to the Court, would have "encompasse[d] nearly any activity by a public official" -- in favor of a more "bounded interpretation." Id. at 2367-68. The Supreme Court set forth that definition in this way. First, it recalled that "an 'official act' is a decision or action on a 'question, matter, cause, suit, proceeding or controversy.'" Id. at 2371 (quoting 18 U.S.C. § 201(a)(3)). It then explained that "[t]he 'question, matter, cause, suit, proceeding or controversy' must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." Id. at 2372. The Court added that "[i]t must also be something specific and focused that is 'pending' or 'may by law be brought' before a public official." Id. Finally, the Court stressed that "[t]o qualify as an 'official act,' the public official must make a

decision or take an action on that 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." Id.

According to Woodward, the trial court's jury instructions and the body of evidence that the jury heard during his trial both illustrate that, after McDonnell, his conviction amounts to a "fundamental legal error" calling for coram nobis relief. We consider these arguments in turn, reviewing the district court's treatment of them de novo. See George, 676 F.3d at 256.

**A.**

We begin with Woodward's claim that the trial court's jury instructions cannot be squared with McDonnell. Those instructions explained the "official act" requirement in this way:

> An official act means any decision or action in the enactment of legislation. The Government doesn't have to show a specific link between a specific item of substantial value and a specific act to be done by the legislator. In other words, the Government does not have to show that there was an agreement requiring the legislator to perform certain specified official acts in exchange for the gratuity. The Government must prove either that the legislator accepted or received the gratuity with the intent to be influenced in the future performance of official duties or that the legislator was influenced in the performance of official duties by the intention that a gratuity would be received.

According to Woodward, these instructions are impermissibly expansive in light of McDonnell. For support, he leans on the Second Circuit's decision in United States v. Silver. See 864 F.3d 102 (2d Cir. 2017). That case involved a post-

-9-

McDonnell challenge to jury instructions defining an "official action" as "any action taken or to be taken under color of official authority." Id. at 112 (emphasis omitted). The Second Circuit found that definition incompatible with McDonnell, as it "captured lawful conduct, such as arranging meetings or hosting events with constituents." Id. at 118.

The instructions at issue in Silver are not comparable to the instructions that the trial court gave the jury at the end of Woodward's trial. Critically, while the Silver instructions defined "official acts" as encompassing "any action taken . . . under color of official authority," the instructions in Woodward's case provided the much narrower definition, "any decision or action in the enactment of legislation." Requiring a tie to the "enactment of legislation" also seems to substantially satisfy McDonnell's definition of "official act." See 136 S. Ct. at 2371-72. The enactment of legislation certainly qualifies as involving a "formal exercise of governmental power" pertaining to a "question, matter, cause, suit, proceeding or controversy" that is "pending . . . before a public official." See id. The only manner we discern in which the instructions may not have comported with McDonnell concerns whether "any decision or action in the enactment of legislation" would leave room for acts falling outside of McDonnell's definition.

-10-

We appreciate the existence of arguments that this language may not precisely comport with McDonnell. Yet we also recall that we do not find ourselves amid a direct appeal from Woodward's conviction, which would call for us to review de novo whether the trial court's instructions correctly captured the relevant law. See United States v. Sasso, 695 F.3d 25, 29 (1st Cir. 2012). Rather, the question before us is whether Woodward's conviction is the result of a fundamental legal error requiring us to dispense the "strong medicine" of coram nobis relief, see George, 676 F.3d at 254 -- which, the Supreme Court has cautioned, is an "extraordinary remedy," United States v. Morgan, 346 U.S. 502, 511 (1954). Below, in analyzing whether Woodward's challenge to the jury instructions called for granting coram nobis relief, the district court reasoned "[o]f course, because my instructions were issued twenty years before McDonnell was decided, the operative language in them is not perfectly congruent with McDonnell, but I nevertheless conclude that my definition of 'official act' sufficiently captured the concerns later addressed in McDonnell." Woodward III, 2017 WL 4684000, at *9. We agree. To the extent that the jury instructions at Woodward's trial did not perfectly anticipate McDonnell, the daylight between those two definitions of "official acts" is so slight that we cannot say we are before "an error of 'the most fundamental character.'"

-11-

<u>George</u>, 676 F.3d at 256 (quoting <u>Hager</u> v. <u>United States</u>, 993 F.2d 4, 5 (1st Cir. 1993); <u>see also</u> <u>Morgan</u>, 346 U.S. at 512.

**B.**

We now turn to Woodward's arguments concerning the evidence that the government introduced against him at trial, beginning with a review of what exactly the government needed to prove to secure a conviction.

To convict Woodward of honest-services mail and wire fraud, the government needed to show that he was engaged in bribery within the statute of limitations period. The statute of limitations period began on July 27, 1990, and Woodward left the Committee on January 19, 1991. <u>Woodward I</u>, 149 F.3d at 52. Citing <u>United States</u> v. <u>Silver</u>, the district court explained -- and Woodward does not contest on appeal -- that "even after <u>McDonnell</u>, the government 'need not prove that an official act occurred within the statute of limitations period.'" <u>Woodward III</u>, 2017 WL 4684000, at *7 (quoting <u>United States</u> v. <u>Silver</u>, 864 F.3d 102, 122 (2d Cir. 2017)). "Rather," it added, "the government 'need only prove that some aspect of the particular quid pro quo scheme continued into the statute of limitations period.'" <u>Id.</u> (quoting <u>Silver</u>, 864 F.3d at 122).

Additionally, to convict Woodward, the government did not need to prove a tight nexus between any particular gratuity

-12-

and a specific official act. Rather, "[b]ribery can be accomplished through an ongoing course of conduct, so long as the evidence shows that the 'favors and gifts flowing to a public official [are] in exchange for a pattern of official actions favorable to the donor.'" United States v. McDonough, 727 F.3d 143, 154 (1st Cir. 2013) (second alteration in original) (quoting United States v. Ganim, 510 F.3d 134, 149 (2d Cir. 2007)). Such a theory of bribery is known as a "stream of benefits" theory. See United States v. López-Cotto, 884 F.3d 1, 8 (1st Cir. 2018) (describing a "'stream of benefits' prosecution approach" as one "wherein a government official is charged with entering into an ongoing agreement to accept benefits in exchange for providing government business to the briber").

In synthesis, the evidence remains sufficient to convict Woodward, even when applying McDonnell, so long as it would have allowed a jury reasonably to conclude that he was engaged in a quid pro quo scheme in which he received gratuities in exchange for one or more official acts, and that he either received gratuities or committed an official act during the statute of limitations period. The statute of limitations period, once more, began on July 27, 1990.

The district court's discussion of the relevant evidence -- which led it to conclude that the jury could have found Woodward

to have carried out some aspect of the quid pro quo scheme during the statute of limitations period -- is useful to review here. First, the district court put forth that "[a] reasonable jury could have found that Woodward undertook 'official acts' for the benefit of Sawyer and Hancock" during the statute of limitations period. Woodward III, 2017 WL 4684000, at *6. Specifically, it referred to our explanation in Woodward I that

> each year from 1985 through 1990, the legislature considered a bill proposing mandatory discounts on life insurance for non-smokers. Hancock and LIAM opposed the bill. In 1989, the bill received favorable recommendation from the Insurance Committee based on support from Senator Linda Melconian, Woodward's co-chair of the Committee. But despite the Committee's favorable report, Woodward led the opposition to the bill in debate before the full House of Representatives, and was successful in defeating the so-called "non-smoker's bill" for that session. Hancock's vice-president, who directly supervised Sawyer, called the bill's defeat a "significant victory for the industry."

Id. (quoting Woodward I, 149 F.3d at 60). The district court reasoned that "[l]eading the opposition to a major piece of legislation plainly qualifies as an 'official act' under McDonnell." Id. As further evidence of pre-statute-of-limitations-period official acts, the district court highlighted the "many instances where Woodward 'carried' pro-insurance bills through the legislative process after they left the [C]ommittee." Id. And it highlighted that in Woodward I, we held that "the jury was entitled

-14-

to believe . . . that 'carrying' means actively guiding a bill through the process; it is not merely ministerial." Id. (quoting Woodward I, 149 F.3d at 61).

Second, the district court added that the evidence would also have allowed the jury to find that Woodward had undertaken an official act for Sawyer's benefit during the statute of limitations period. See id. at *7. This evidence also pertained to the non-smoker's bill. As we summarized in Woodward I:

> As evidence of Woodward's post-gratuity activity, the government points to Woodward's action with respect to S. 641, which proposed premium reductions in life insurance for policyholders who were non-smokers. The bill was originally reported favorably out of the Insurance Committee on May 7, 1990. Then on July 24, 1990, just before becoming law, the House of Representatives recommitted the bill to the Insurance Committee. The effect of a bill's recommittal is that both chairs would have to act in order for the bill to be released. The bill languished in the Insurance Committee with no further action taken through January 1, 1991, after Woodward received . . . gratuities and prior to his removal as co-chair. Woodward's cochair, Senator Melconian, had actively supported the 1989 bill by requesting a favorable recommendation from the Insurance Committee. The jury could, therefore, reasonably have inferred that Woodward prevented any further action on S. 641, because in the previous year he led the floor debate, on behalf of Hancock and LIAM, against a similar non-smokers bill.

Woodward I, 149 F.3d at 66.

Third, the district court found that "the record is clear that Woodward received benefits from Sawyer after July 27, 1990."

-15-

Woodward III, 2017 WL 4684000, at *7. For support, it pointed to our observation in Woodward I that

> After entertaining Woodward for several days at the Scottsdale COIL conference in 1991, Sawyer left the conference early, but left his credit card to be used for paying Woodward's golf and meal expenses during the remainder of the conference. This is not consistent with mere friendship as the sole purpose of these payments, but rather is more consistent with the theory of a gratuity made because of Woodward's potential official actions.

See id. (quoting Woodward I, 149 F.3d at 58). So too did the district court make reference to our conclusion in Woodward I that the jury could have reasonably found Sawyer to have provided gratuities to Woodward at a conference in Orlando in November of 1990. Id. We also add that, in Woodward I, we found the evidence to show that Woodward began receiving gratuities from Sawyer before the statute of limitations period -- as early as in 1984. Woodward I, 149 F.3d at 52.

In light of all of this evidence, the district court concluded that "a reasonable jury could have found [that] Woodward committed quid pro quo bribery" during the statute of limitations period, McDonnell's narrower definition of "official acts" notwithstanding. Woodward III, 2017 WL 4684000, at *6. Woodward disagrees. He argues that, in denying his petition below, the district court relied on a "stream of benefits" theory of bribery that is no longer valid. Specifically, he asserts that "after

-16-

McDonnell, the stream of benefits theory does not relieve the government of its burden to identify and prove the specific official acts that Woodward intended to perform with a corrupt intent." But this is incorrect. Woodward stresses that a discussion of the "stream of benefits" theory is "conspicuously absent from the McDonnell opinion," suggesting that McDonnell implicitly invalidated that theory. We think, though, that a better reading of McDonnell indicates that the Court did not discuss the "stream of benefits" theory not out of disapproval of it, but rather because it was not implicated in that case. Indeed, McDonnell hinged on whether the trial court had provided too broad a definition of "official acts" in its jury instructions. 136 S. Ct. at 2374. The Court did not take up whether the government had adequately proven a nexus between the gratuities he received and the acts he allegedly undertook as a result. Thus, we remain confident that a "stream of benefits" theory of bribery remains valid today. Woodward is therefore unsuccessful in arguing that coram nobis relief is necessary because his conviction rested on such a theory.

Woodward next argues that the district court below incorrectly identified his role in tanking the non-smokers bill as a post-McDonnell official act. But Woodward cannot get out from under our holding in Woodward I that the jury could "reasonably

-17-

have inferred that [in 1990,] Woodward prevented any further action on S. 641, because in the previous year he led the floor debate, on behalf of Hancock and LIAM, against a similar non-smokers bill." 149 F.3d at 66. And actively preventing a vote to take place on a particular piece of proposed legislation falls well within McDonnell's definition of "official acts." See 136 S. Ct. at 2371-72.

Woodward likewise contests the notion that "carrying" bills once they had left the Committee qualifies as an official act. We disagree. For in Woodward I, as the district court noted, we held that the evidence would have permitted the jury to conclude that "'carrying' mean[s] actively guiding a bill through the process," as opposed to being "merely ministerial" in nature. Woodward I, 149 F.3d at 61. Furthermore, even if that were not so, it would not mean that Woodward's conviction was the product of error. Independent of Woodward's carrying of pro-industry bills through the legislative process, his opposition to S. 641 -- which Hancock did not want to pass -- supplies another official act during the statute of limitations period that a jury could reasonably have found him to have undertaken in exchange for the gratuities he received.[1]

---

[1] In a post-argument letter submitted pursuant to Federal Rule of Appellate Procedure 28(j), Woodward brought to our attention United States v. Fattah, No. 16-4397, 2018 WL 3764543 (3d Cir.

Lastly, Woodward asserts that coram nobis relief from his conviction is also imperative in light of Skilling v. United States -- in which the Supreme Court held that honest-services fraud does not include "undisclosed self-dealing" or the failure to disclose conflicts-of-interest. See 561 U.S. at 409-11. But this likewise does not provide us with occasion to grant that relief. The Supreme Court's decision in Skilling, which is now eight years old, formed the basis of Woodward's first coram nobis petition. The district court denied that petition, and Woodward did not appeal. Insofar as Woodward hasn't waived any Skilling-based argument, we cannot say that, in invoking that case now, he

---

Aug. 9, 2018). Woodward argues that Fattah rejected two propositions "advanced generally by the government" in this case: 1) that a conviction can stand when only one of various "official acts" charged met McDonnell requirements; and 2) the government's theory of a "pattern" of unspecified acts, as both allowed the jury to convict on acts insufficient under McDonnell. We will not discuss now whether these points correctly interpret Fattah or properly describe the government's theories, as in any case, they are inapplicable: we have determined here that the acts Woodward challenged could constitute "official acts" under McDonnell that a jury could reasonably have concluded Woodward undertook in exchange for the gratuities he received. This is the case with: 1) Woodward's role in tanking the non-smokers bill; and 2) Woodward's "carrying" of pro-industry bills through the legislative process. See supra at 17-18. Additionally, while Fattah stemmed from a direct appeal, the bar to grant coram nobis relief is much higher. Hence, nothing in Fattah persuades us to depart from our conclusion that Woodward failed to demonstrate that his conviction is the result of a fundamental error.

-19-

has adequately "explain[ed] his failure to seek earlier relief from the judgment." George, 676 F.3d at 254.

Woodward, therefore, has failed to show that his conviction is the result of a fundamental legal error that would render the extraordinary post-conviction remedy of coram nobis relief appropriate.

## III.

Because Woodward has not demonstrated that his conviction is the result of any fundamental error, he cannot prevail in his petition for coram nobis relief. We, therefore, "decline to exercise [our] discretion so as to disturb a judgment that has long since become final." Id. at 260.

**Affirmed**.