RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0287p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JAMES C. DIMORA,

*Petitioner-Appellant*,

*v.*

No. 18-4260

UNITED STATES OF AMERICA,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
Nos. 1:10-cr-00387-1; 1:17-cv-01288—Sara E. Lioi, District Judge.

Argued: April 16, 2020

Decided and Filed: August 31, 2020

Before: MERRITT, THAPAR, and LARSEN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David E. Mills, THE MILLS LAW OFFICE LLC, Cleveland, Ohio, for Appellant. Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** David E. Mills, THE MILLS LAW OFFICE LLC, Cleveland, Ohio, Philip S. Kushner, KUSHNER & HAMED CO., L.P.A., Cleveland, Ohio, for Appellant. Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

The court delivered a PER CURIAM opinion. MERRITT, J. (pp. 15–17), delivered a separate dissenting opinion.

---

**OPINION**

---

PER CURIAM. In 2012, a federal jury convicted James Dimora of numerous bribery-related offenses committed during his tenure on the Board of County Commissioners for Cuyahoga County, Ohio. Four years later, in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), the Supreme Court gave a narrow construction to a key element included within several of those offenses. Dimora then petitioned to vacate his convictions under 28 U.S.C. § 2255, arguing that the jury instructions used at his trial were faulty in light of *McDonnell*. The district court denied relief. For the reasons that follow, we VACATE the district court's order, DENY Dimora's request to expand the scope of the Certificate of Appealability, and REMAND for further proceedings consistent with this opinion.

I.

From 1998 until 2010, Dimora served as one of three elected commissioners on the Board of County Commissioners for Cuyahoga County. At that time, the Commissioners served as the official head of County government; as such, they wielded significant control over the County's affairs.[1] For example, the Commissioners had the authority to purchase or lease property; construct County facilities; sell, lease, or rent County property; approve economic development loans and grants; approve budgets for various departments of County government; and enter into certain contracts on behalf of the County. *See* Ohio Rev. Code § 307.01 *et seq*.

In 2007, the FBI launched an investigation into public corruption in Cuyahoga County. The investigation revealed that Dimora had received over $250,000 in gifts (or as the FBI and jury would later conclude, bribes) from individuals with business before the County. These gifts included home renovations, expensive dinners, trips to Las Vegas, and encounters with prostitutes. At the same time, Dimora had used his position as County Commissioner to help the gift givers in various ways. The investigation concluded that he had corruptly influenced the

---

[1]Subsequent to Dimora's arrest, and perhaps because of it, the people of Cuyahoga County voted to alter the structure of their government. *See United States v. Dimora*, 750 F.3d 619, 623 (6th Cir. 2014). Now, the County government is led by a council and a single executive. *Id.*

awarding of County contracts and grants, the hiring of County employees, the results of at least one County election, and the outcome of civil litigation in County and municipal courts. Dimora's "influence" on these matters ranged from casting formal votes as Commissioner to calling, meeting, and pressuring other relevant officials.

A federal grand jury indicted Dimora on thirty-four counts in September of 2011. The indictment charged seventeen counts of Hobbs Act conspiracy and Hobbs Act offenses under 18 U.S.C. § 1951; four counts of bribery concerning programs receiving federal funds under 18 U.S.C. §§ 666(a)(1)(B) and 2; four counts of making false statements on tax returns under 26 U.S.C. § 7206(1); two counts of conspiracy to commit mail fraud and honest services mail fraud under 18 U.S.C. §§ 1341, 1346, and 1349; two counts of conspiracy to commit bribery concerning programs receiving federal funds under 18 U.S.C. § 371; one count of conspiracy to commit wire fraud and honest services wire fraud under 18 U.S.C. §§ 1343, 1346, and 1349; one count of RICO conspiracy under 18 U.S.C. § 1962(d); one count of mail fraud under 18 U.S.C. § 1341; one count of conspiracy to obstruct justice under 18 U.S.C. §§ 371 and 1512; and one count of obstructing a federal investigation under 18 U.S.C. §§ 1519 and 2. Dimora pleaded not guilty and the case proceeded to trial.

Dimora's trial lasted for thirty-seven days. The government's star witness was Frank Russo, who served as County Auditor when Dimora was Commissioner. Russo testified that he and Dimora maintained an elaborate network of "sponsors" who financed their social activities and provided them with gifts in exchange for "personal attention" on matters pending before the County. These matters ranged from "a daughter getting a parking ticket" to "a son wanting a [County] job" to "a brother . . . wanting a contract [with the County]."

The government also presented testimony from the so-called "sponsors." For example, Ferris Kleem—a local contractor and businessman—testified that he had provided Dimora with dinners, jewelry, a television and refrigerator, and a trip to Las Vegas that included flights, a hotel suite, gambling money, and an encounter with a prostitute. Kleem explained that he had provided these gifts to stay in Dimora's "good graces" and "gain influence [in] Cuyahoga County." And, according to Kleem, Dimora returned the favor: he helped Kleem obtain a development grant from the County and win a construction bid for the County's new Juvenile

Justice Center, while also arranging for Kleem's cousin to obtain a job with the County and assisting Kleem's brother with a smoking violation filed against his restaurant.

Several other sponsors testified as well. Their testimony shared a similar theme: each had provided Dimora with substantial gifts with the hope and expectation that he would later use his influence to help them with County business; and Dimora did, in fact, deliver on that expectation for each of them. As one sponsor testified regarding Dimora and Russo, "they helped me; I helped them."

Two components of Dimora's defense are relevant here. First, Dimora sought to introduce ethics reports in which he disclosed that he had received unspecified gifts valued at more than $75 from most of the sponsors who testified. These reports, he argued, would show that he had not acted with a corrupt intent. But, after the government objected, the district court ruled that the reports were inadmissible. The court concluded that the reports contained "hearsay statements by Mr. Dimora" and their admission would be "tantamount to permitting [Dimora] to testify without being cross-examined." Additionally, the court believed that the reports would be "very confusing" to the jury. The ethics reports, consequently, were excluded at trial.

Second, Dimora attempted to show that any favors he provided to the sponsors were insufficient to support a bribery conviction.[2] Under the bribery statutes, the government needed to prove that Dimora had agreed to commit an "official act" in exchange for items of value. *See* 18 U.S.C. § 201.[3] Dimora sought to narrowly define the scope of that term. He proposed jury instructions that, as relevant here, would have told the jury that "official acts" did not include "merely . . . recommending or introducing a giver to other decision makers."

---

[2]The district court used "bribery" as a shorthand to refer to the following crimes in the Indictment: (i) bribery concerning programs receiving federal funds, 18 U.S.C. § 666(a)(1)(B); (ii) conspiracy to commit bribery concerning programs receiving federal funds, 18 U.S.C. § 371; (iii) Hobbs Act extortion, 18 U.S.C. § 1951; (iv) conspiracy to commit Hobbs Act extortion, 18 U.S.C. § 1951; (v) conspiracy to commit honest services wire fraud; (vi) honest services mail fraud, 18 U.S.C. § 1346; and (vii) conspiracy to commit honest services mail fraud, 18 U.S.C. § 1346. We repeat that shorthand here.

[3]The Supreme Court has construed Hobbs Act extortion and honest services fraud to require proof of bribery. *See Skilling v. United States*, 561 U.S. 358, 368 (2010) (holding that Honest Services Fraud "covers only bribery and kickback schemes"); *Evans v. United States*, 504 U.S. 255, 260 (1992) (holding that Hobbs Act extortion includes "taking a bribe"). Thus, courts commonly construe these statutes as requiring an "official act" as defined in the federal bribery statute, 18 U.S.C. § 201—even though neither the Hobbs Act extortion nor honest services fraud statutes use that term. *See, e.g.*, *McDonnell*, 136 S. Ct. at 2365.

The district court rejected Dimora's proposed instructions. Instead, the court adopted the following language:

> The term "official act" includes any decision or action on any question, matter, cause, suit, proceeding, or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit. *Official acts include the decisions or actions generally expected of the public official. In addition, "official action" includes the exercise of both formal official influence (such as a public official's votes) and informal official influence (such as a public official's influence on other public officials).* The term "official act" does not include actions taken in a personal or non-official capacity, such as actions taken as a political party leader.

R. 735-1, PageID 16988–89 (emphasis added). Dimora objected, arguing that this definition was "too broad." The district court overruled that objection and the above definition was included in the court's jury instructions at the end of trial.

The jury convicted Dimora on thirty-three of the thirty-four counts, including all of the bribery charges. After trial, Dimora moved for a new trial.[4] Relevant here, he argued that the district court had erred by (i) instructing the jury to use an overly broad definition of "official acts," and (ii) excluding his state ethics reports at trial. The district court denied Dimora's motion.

Dimora reiterated those same two arguments on appeal. *United States v. Dimora*, 750 F.3d 619, 624–30 (6th Cir. 2014). Our court rejected the jury-instruction claim, concluding that the "instructions fairly trace[d] the line between permissible gifts and impermissible bribes." *Id.* at 625. We agreed, however, that the district court erred when it ruled that the ethics reports were inadmissible hearsay. *Id.* at 628. Yet because we concluded that "overwhelming evidence" showed that Dimora had "made phone calls and held meetings on the bribers' behalf," we held that the district court's error was harmless and affirmed Dimora's convictions. *Id.* at 628–30. *But see id.* at 632–33 (Merritt, J., dissenting).

---

[4]Dimora also moved for acquittal, arguing that the evidence was insufficient to support his convictions. The district court concluded that the evidence was insufficient to support a conviction on Count 10 of the indictment, which had charged Dimora with Hobbs Act Conspiracy. Accordingly, the district court partially granted Dimora's motion for acquittal and vacated his conviction on Count 10.

Two years later, the Supreme Court construed the term "official act" to exclude most phone calls and meetings. *See McDonnell*, 136 S. Ct. at 2367–68. *McDonnell* involved the former governor of Virginia who, like Dimora, had been charged with various bribery offenses, including Hobbs Act extortion and honest services fraud. *Id.* at 2365. And like here, the trial court in *McDonnell* had instructed the jury that "official acts" include any "acts that a public official customarily performs." *Compare id.* at 2366, *with* R. 735-1, PageID 16988–89 (defining official acts to include "decisions or actions generally expected of the public official"). The Supreme Court vacated McDonnell's convictions, concluding that constitutional concerns and the statutory text required a narrow reading of the term "official acts." *See McDonnell*, 136 S. Ct. at 2367–73, 2375. "[S]etting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act.'" *Id.* at 2368. Instead, the Court held that "official acts" are limited to "formal exercise[s] of governmental power." *Id.*

Dimora filed a petition to vacate his conviction under 28 U.S.C. § 2255. He argued that, in light of *McDonnell*, the trial court's jury instructions had erroneously allowed the jury to convict him of lawful conduct. The district court denied Dimora's petition, concluding that its instructions had "sufficiently captured" the concerns raised by *McDonnell*. Alternatively, the court concluded that any instructional error had been harmless because, "with few exceptions, the conduct . . . underl[ying] Dimora's convictions qualifie[d] as official acts" post-*McDonnell*. Our court then granted Dimora a Certificate of Appealability (COA). *Dimora v. United States*, No. 18-4260, slip op. at 6 (6th Cir. Mar. 27, 2019) (order). This appeal followed.

II.

We review the district court's denial of a § 2255 motion de novo. *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003). Our inquiry here is three-fold. First, Dimora must demonstrate that the trial court's jury instructions violated "the Constitution or laws of the United States."[5] *See* 28 U.S.C. § 2255. Second, if he makes that showing, we must determine

---

[5]Not every violation of federal law is sufficient to state a claim for habeas relief. Generally, claims of non-constitutional error are cognizable under § 2255 "only if they involved 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Snider v. United States*, 908 F.3d 183, 189 (6th Cir. 2018) (quoting *Davis v. United States*, 417 U.S. 333, 346 (1974)). Here, the government has argued neither (1) that the instructional error asserted by Dimora is non-constitutional nor, if so, (2) that it does not rise to the level of a

whether the instructional error "had a substantial and injurious effect or influence on the . . . jury's verdict." *Griffin*, 330 F.3d at 736; *see also O'Neal v. McAninch*, 513 U.S. 432, 437–38 (1995). Finally, if we conclude that the instructional error by itself was harmless, we must determine whether the "cumulative effect" of the instructional error and the evidentiary error (which we recognized on direct appeal) entitles Dimora to relief. *See Schledwitz v. United States*, 169 F.3d 1003, 1016 (6th Cir. 1999).[6]

A.

We begin with the merits of Dimora's instructional claim. A trial court's jury instructions must, as a whole, "accurately . . . reflect the law." *United States v. Geisen*, 612 F.3d 471, 485 (6th Cir. 2010) (citation omitted); *see also United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017) ("[A] jury instruction [is] erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." (quotation marks omitted)). Dimora argues that the trial court's instructions misstated the law by allowing the jury to "convict [him] for conduct that was not unlawful." We agree.

An "official act" is defined as any "decision or action" on any "question, matter, cause, suit, proceeding or controversy" pending before a public official.[7] *See* 18 U.S.C. § 201. That definition contains a "two-part test." *United States v. Lee*, 919 F.3d 340, 350 (6th Cir. 2019). First, an official act must involve an official issue—a "question, matter, cause, suit, proceeding or controversy." *Id.* (quoting *McDonnell*, 136 S. Ct. at 2368). Second, the public official must

---

"fundamental defect," *see Davis*, 417 U.S. at 346. Accordingly, we assume that Dimora's instructional claim is cognizable under § 2255 without deciding whether it is constitutional in nature. We note, however, that the Supreme Court's decision in *McDonnell*—which applied a harmless-error standard reserved for constitutional error—suggests that Dimora's instructional claim is one of constitutional error. *See* 136 S. Ct. at 2375 ("[W]e cannot conclude that the errors in the jury instructions were 'harmless beyond a reasonable doubt.'" (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)).

[6]*See also Dimora*, No. 18-4260, slip op. at 6 (order) (granting a COA on "whether: (1) the district court's jury instructions regarding an 'official act' were erroneous in light of *McDonnell*; (2) the instructional error, if any, was harmless; and (3) the exclusion of his ethics reports at trial was still harmless when combined with any instructional error").

[7]The full definition reads: "the term 'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3).

have "made a decision or t[aken] an action," or "agreed to do so," on that official issue. *Id.* (quoting *McDonnell*, 136 S. Ct. at 2368).

Informal acts—like merely "setting up a meeting, calling another public official, or hosting an event"—fail both prongs of that test. *See McDonnell*, 136 S. Ct. at 2368–70. Under the first prong, "a typical meeting, telephone call, or event arranged by a public official" does not qualify as a "question, matter, cause, suit, proceeding or controversy." *Id.* at 2368. Instead, the statutory terms "connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination." *Id.* And under the second prong, "hosting an event, meeting with other officials, or speaking with interested parties is not, *standing alone*, a 'decision or action.'" *Id.* at 2370 (emphasis added). "Something more is required," such as (a) "using [an] official position to exert pressure on another official to perform an 'official act'" or (b) "us[ing] [an] official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act.'" *Id.*

Given this complexity, the Supreme Court held in *McDonnell* that three clarifying instructions are needed to prevent a jury from convicting the defendant for lawful conduct. *Id.* at 2374–75. First, the trial court should "instruct[] the jury that it must identify a 'question, matter, cause, suit, proceeding or controversy' *involving the formal exercise of governmental power.*" *Id.* at 2374 (emphasis added). Second, the trial court should "instruct[] the jury that the pertinent 'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought before any public official.'" *Id.* Third, the trial court should "instruct[] the jury that merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter." *Id.* at 2375.

Here, the trial court's instructions (understandably) did not contain those clarifications. Instead, in addition to the statutory definition, the trial court offered three clarifying instructions of its own:

> [1] Official acts include the decisions or actions generally expected of the public official. [2] In addition, "official action" includes the exercise of both formal official influence (such as a public official's votes) and informal official influence (such as a public official's influence on other public officials). [3] The term

"official act" does not include actions taken in a personal or non-official capacity, such as actions taken as a political party leader.

R. 725-1, PageID 16989.

The government claims that these clarifications "addressed *McDonnell*'s concerns using different language." It points primarily to the second sentence above, which told the jury that "'official action' includes the exercise of both formal official influence (such as a public official's votes) and informal official influence (such as a public official's influence on other public officials)." According to the government, this instruction "limited official action to formal exercises of official influence such as voting on a matter and defined qualifying informal official influence as influencing another public official." Thus, the government asserts, that instruction "eliminated the ability for the jury to convict Dimora for simply making a phone call or an introduction for networking purposes without . . . an associated attempt to influence another official."[8]

That interpretation is wishful thinking. The district court told the jury that official action "*includes*" the exertion of "informal official influence (*such as* a public official's influence on other public officials)." R. 735-1, PageID 16989 (emphases added). The government claims that this statement somehow "limited" the definition of official action to formal exercises of power and the pressuring of other officials to perform official acts—both of which are still proper after *McDonnell*. But the words "such as" and "includes" do not carry that sort of limiting effect. Instead, the jury was free to follow the district court's preceding statement that official acts include all "actions generally expected of the public official." And, indeed, at closing, the government explicitly asked the jury to do so:

So let's start again with the law, and specifically the law on official acts. . . . *[Y]our jury instructions say that "An official act is any decision or action expected by a public official," any decision or any action*. . . . It can be informal. And think about all the different informal things that public officials do . . . . They

---

[8]The government also points to additional language in a different section of the instructions defining bribery and kickbacks. This language states, "bribery or kickbacks are not provided if the benefit is intended to be, and is accepted as, simply an effort to buy favor or generalized goodwill from a public official who . . . is . . . in a position to act favorably on the giver's interests." The government contends that this "additional limiting language" further captured *McDonnell*'s concerns. But this language does nothing to exclude meetings or phone calls from the definition of "official acts."

> hold meetings. They direct their staff. . . . Commissioners do more than just vote. Commissioners have meetings with people in the business community. Commissioners place calls to other public officials. . . . Anything commissioners do because they're a commissioner -- for example, because he's the commissioner, he can tell Renee Strong to schedule a meeting. . . . Those are official acts.

R. 1046, PageID 30469–70 (emphasis added). The breadth of the government's interpretation at closing reveals the lack of any meaningful limitation in the instructions; and the absence of that limitation is precisely why the instructions "fail[ed] accurately to reflect the law." *Geisen*, 612 F.3d at 485 (citation omitted).

*McDonnell* rejected instructions that were very similar to the trial court's instructions here. *See* 136 S. Ct. at 2373–74. In *McDonnell*, the trial court had told the jury that official acts "include acts that a public official customarily performs" and actions taken "to exercise influence or achieve an end." *Id.* at 2373. The Supreme Court held that those instructions were erroneous because they "lacked important qualifications" and were "significantly overinclusive." *Id.* at 2374. The same is true here. The instructions at Dimora's trial defined official acts as any "actions generally expected of the public official" including "the exercise of . . . informal official influence" over other public officials. We conclude that those instructions are similarly overinclusive and lacking in important qualifications.

Persuasive authority from the Second and Third Circuits supports this conclusion. In the wake of *McDonnell*, both courts have invalidated convictions based on jury instructions similar to those used by the trial court here. *See Silver*, 864 F.3d at 118; *United States v. Skelos*, 707 F. App'x 733, 736 (2d Cir. 2017); *United States v. Fattah*, 914 F.3d 112, 152–54, 189 (3d Cir. 2019). For example, in *Silver*, the instructions stated that "[o]fficial action includes any action taken or to be taken under color of official authority." 864 F.3d at 112 (alteration in original) (emphasis omitted). And in *Skelos*, the instructions stated that official acts "include acts customarily performed by a public official with a particular position," 707 F. App'x at 736. In both cases, the Second Circuit held that *McDonnell* had rendered those instructions erroneous. *See Silver*, 864 F.3d at 112; *Skelos*, 707 F. App'x at 736. Similarly, in *Fattah*, the Third Circuit held that instructions were erroneous because "the jury was not instructed that they had to place [the defendant's] efforts on one side or the other of th[e] divide" between "permissible attempts

to express support" and "impermissible attempts to pressure" another official. *Fattah*, 914 F.3d at 156.

The government points to the First Circuit's decision in *Woodward v. United States*, 905 F.3d 40, 45 (1st Cir. 2018), which held that a trial court's pre-*McDonnell* instructions had "sufficiently captured" *McDonnell*'s concerns. But, as *Woodward* acknowledged, the instructions given in that case were "not comparable" to the instructions in cases like *Silver*. *Id.* Nor are they comparable here. The trial court in *Woodward* had narrowly defined official acts as "any decision or action *in the enactment of legislation.*" *Id.* (emphasis added). By tying the definition to the enactment of legislation, the trial court had "substantially satisf[ied] *McDonnell*'s definition of 'official act.'" *Id.* Here, however, the trial court's instructions imposed no such constraint. The instructions defined official acts as any action "generally expected of the public official." Just like the instructions in *Silver*, *Skelos*, and *Fattah*, this definition was "significantly overinclusive." *See McDonnell*, 136 S. Ct. at 2373–74. Although we do not fault the trial court for failing to anticipate *McDonnell*, we conclude that its instructions were erroneous in light of that decision.

B.

That still leaves the question of harmlessness. An instructional error warrants habeas relief only if it "had a 'substantial and injurious effect or influence [o]n. . . the jury's verdict.'" *See Fair v. United States*, 157 F.3d 427, 430 (6th Cir. 1998) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). That standard requires more than just a "reasonable possibility" that the error was harmful. *Davis v. Ayala*, 576 U.S. 257, 268 (2015). A habeas court cannot require the government to undertake "the arduous task of retrying a defendant based on mere speculation that the defendant was prejudiced by trial error." *Id.* (alterations adopted) (quoting *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam)). But, at the same time, "[t]he inquiry cannot be merely whether there was enough [evidence] to support the result." *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Instead, the Supreme Court has directed us to ask: "Do I, the judge, think that the error substantially influenced the jury's decision?" *Id.* at 436. If the answer is "yes" or the court is in "grave doubt" about the error's harmlessness, the conviction cannot stand. *Id.* at 437.

The district court recognized these principles but erred in their application. First, the court repeatedly relied on evidence sufficiency to conclude that any instructional error was harmless. *See, e.g.*, R. 1196, PageID 33170–71 ("From this evidence, *a rational juror could have concluded* that Dimora sought, through Russo, to pressure or advise government officials to take official action for Valentin's benefit." (emphasis added)); *id.*, PageID 33178 ("Based on this exchange, *the jury could also have properly found* that Dimora's support for Neiheiser and his project was clearly offered and intended to exert pressure on Fitzgerald to perform the official act of privatizing the rink and selling it to Neiheiser." (emphasis added)). Instead of focusing on what a rational jury could have found, the district court should have determined whether the actual jury in Dimora's trial was "substantially influenced" by the instructional error. *O'Neal*, 513 U.S. at 436.

Second, the court repeatedly pointed back to its belief that the instructions had been adequate to conclude that any error was harmless. *See, e.g.*, R. 1196, PageID 33174 ("Applying the Court's instructions, a rational juror would have concluded that offering a letter of recommendation for a friend's daughter [was insufficient]"); *id.*, PageID 33167 ("Still, the Court's charge would have informed the jury that such an act did not qualify under the law."); *id.*, PageID 33178 ("Because the jury was properly instructed on these counts . . . there is no prejudice and no reason to justify vacating these counts."); *id.*, PageID 33187 ("Those few acts that would no longer pass muster under *McDonnell* would have been disregarded by a rational juror applying the Court's instructions."). By bootstrapping its harmlessness finding to the purported validity of the instructions, the district court rested its harmless-error analysis on a faulty premise.

Rather than attempting the harmless-error analysis ourselves, however, we believe the more "prudent" course is to remand for the district court to conduct the proper analysis in the first instance. *See Besser v. Walsh*, 601 F.3d 163, 189 (2d Cir. 2010). The Supreme Court has tasked lower courts with asking, "Do I, the judge, think that the error substantially influenced the jury's decision?" *O'Neal*, 513 U.S. at 436. Here, Dimora was convicted after a thirty-seven-day trial, in which the jury heard testimony from more than sixty witnesses and deliberated on thirty-four different counts. On this record, we believe the district court—which also presided over

Dimora's trial—is far better equipped to determine whether the instructional error substantially influenced the jury's verdict. Accordingly, we remand for the district court to apply properly the harmless-error standard in the first instance.

But our remand is limited. The COA excluded any review of Dimora's convictions for bribery concerning programs receiving federal funds under 18 U.S.C. §§ 666 and 371 (Counts 4–6, 17–19), conspiracy to commit mail fraud and honest services mail fraud under 18 U.S.C. § 1349 (Counts 2, 9, and 16), RICO conspiracy under 18 U.S.C. § 1962(d) (Count 1), conspiracy to obstruct justice under 18 U.S.C. §§ 1512 and 371 (Count 28), and falsification of records in a federal investigation under 18 U.S.C. §§ 1519 and 2 (Count 29). Although Dimora urges us to expand the scope of the COA to include these counts of conviction, we decline to do so for the reasons stated in our prior order. *See Dimora*, No. 18-4260, slip op. at 4–6 (order).

Moreover, not all of the counts before us require further analysis on remand. With respect to Counts 8, 22, and 23, the government relied exclusively on votes Dimora had cast as commissioner to show "official acts" for convictions of Hobbs Act offenses under 18 U.S.C. § 1951. Because "formal exercise[s] of governmental power" are quintessential official acts, *see McDonnell*, 136 S. Ct. at 2368, the trial court's instructional error clearly did not have a "substantial and injurious effect or influence on the . . . jury's verdict" with respect to those counts, *see Griffin*, 330 F.3d at 736. Accordingly, the district court need not reconsider whether the instructional error prejudiced Dimora with respect to those convictions; we conclude that it did not.

## C.

Finally, because we do not decide whether the instructional error was harmless with respect to most of the counts before us, we also do not decide whether the "cumulative effect" of the instructional and evidentiary errors entitles Dimora to relief. *See United States v. Parker*, 997 F.2d 219, 221 (6th Cir. 1993). We note, however, that we are uncertain whether this theory of prejudice is available to § 2255 petitioners. *See United States v. Brown*, 528 F.3d 1030, 1034 (8th Cir. 2008) ("[W]e have repeatedly rejected the cumulative error theory of post-conviction relief."). And we are especially uncertain that it is available where one of two claimed errors is

an evidentiary error.  *See Davis v. United States*, 417 U.S. 333, 346 (1974) (holding that non-constitutional claims are cognizable under § 2255 only if "the claimed error . . . [is] a fundamental defect which inherently results in a complete miscarriage of justice").  But we leave these questions for the district court to consider on remand after it assesses the harmlessness of the instructional error independent of any cumulative effect.

\* \* \*

For the foregoing reasons we VACATE the district court's judgment, DENY Dimora's request to expand the scope of the COA, and REMAND for further proceedings consistent with this opinion.

———————————

**DISSENT**

———————————

MERRITT, Circuit Judge, dissenting. I respectfully dissent from my colleagues' decision to remand this case to the district court for it to conduct its own harmless-error analysis. I would vacate all counts contained in the Certificate of Appealability and remand for a new trial before a properly instructed jury.

There is no question that the district court erroneously instructed the jury in light of *McDonnell v. United States*, 136 S. Ct. 2355 (2016). It is also clear that the erroneous instructions "had a substantial and injurious effect or influence [o]n . . . the jury's verdict" because the instructions allowed the jury to convict Dimora based on lawful conduct. *See Fair v. United States*, 157 F.3d 427, 430 (6th Cir. 1998) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see also McDonnell*, 136 S. Ct. at 2375 ("Because the jury was not correctly instructed on the meaning of 'official act,' . . . we cannot conclude that the errors in the jury instructions were 'harmless beyond a reasonable doubt.'"); *United States v. Fattah*, 914 F.3d 112, 155 (3d Cir. 2019) ("Because the jury may have convicted Fattah for conduct that is not unlawful, we cannot conclude that the error in the jury instruction was harmless beyond a reasonable doubt . . . ."); *United States v. Silver*, 864 F.3d 102, 124 (2d Cir. 2017) (concluding that the erroneous jury instructions were not a harmless error).

The overwhelming majority of the counts involve both acts that remain "official" under *McDonnell* and acts that we now know are legal. The Supreme Court, the Second Circuit, and the Third Circuit have all recognized that neither we—nor the district court—can assume that the jury did not convict Dimora for legal conduct. *See McDonnell*, 136 S. Ct. at 2375 ("Because the jury was not correctly instructed on the meaning of 'official act,' it may have convicted Governor McDonnell for conduct that is not unlawful."); *Fattah*, 914 F.3d at 157 ("But, as we have explained, we cannot rule out that the jury erroneously convicted [the defendants] based on other actions that were not official acts under *McDonnell*.") (footnote omitted); *United States v. Silver*, 864 F.3d at 119 ("While the Government presented evidence of acts that remain 'official' under *McDonnell*, the jury may have convicted [the defendant] for conduct that is not unlawful,

and a properly instructed jury might have reached a different conclusion.") (footnote omitted). For example, in Counts 20 and 21, the government alleged several "official acts." Some of these acts were votes by Dimora approving county loans to a business owned by Steven Pumper, an acquaintance of Dimora's doing business with the county. These acts remain "official" under *McDonnell*. Other acts, however, include Dimora arranging meetings and making phone calls for Pumper. Because the jury instructions did not include "the principles laid down in *McDonnell*," the jury was free to conclude that the phone calls and arranging of meetings were themselves official acts—"and it may have done so." *See Fattah*, 914 F.3d at 154. Moreover, the fact-intensive inquiries necessary to determine the legality of most of Dimora's actions, such as how forceful the language and tone used in a telephone call must be "before it becomes impermissible 'pressure or advice' . . . falls within the domain of a properly instructed jury." *Fattah*, 914 F.3d at 156. I would therefore hold that the jury instructions were erroneous, that the error was not harmless, and vacate all convictions contained in the Certificate of Appealability. *See McDonnell*, 136 S. Ct. at 2375 ("We accordingly vacate Governor McDonnell's convictions."); *Fattah*, 914 F.3d at 146 ("We hold that the District Court erred in upholding the jury verdict in light of *McDonnell*, and we will therefore reverse and remand for retrial on Counts 16, 17, 18, 22, and 23."); *Silver*, 864 F.3d at 124 (vacating counts to which *McDonnell* applied).

I would vacate all counts in this appeal, including the counts that involve only acts that remain "official" under *McDonnell*, because of the district court's erroneous exclusion of the ethics reports. *See United States v. Dimora*, 750 F.3d 619, 632–33 (6th Cir. 2014) (Merritt, J., dissenting). I explained in my earlier dissent:

> Subjective intent is the keystone of bribery. The influence of money in politics is growing by leaps and bounds, and the subjective intent of the public official receiving the money is perhaps the last and only distinguishing feature between criminal 'quid pro quo bribery' and permissible 'ingratiation.' . . . The exchange for money for 'ingratiation and access is not corruption' at all; indeed, the exchange is so essential to the foundation of democracy that it is protected by the First Amendment.

*Id.* at 632 (internal citations omitted). The ethics reports were paramount to Dimora's defense that he did not have the necessary intent for conviction. Now that actions qualifying as "official"

are much more limited under *McDonnell*, the ability for Dimora to present to a jury that he disclosed gifts from his alleged bribers is even more important to his defense and his receiving a fair trial. Additionally, the treatment of the ethics reports by the prosecution, defense counsel, and the district court show their importance to Dimora's defense. "[T]he prosecutor promised the jury that she would show a culture of secrecy and nondisclosure shielding Dimora's corruption" and "fought tooth and nail, in sidebar and outside of the jury's presence, to keep these ethics reports out of evidence." *Id.* at 633. "Dimora promised, after assurance from the district court that the ethics reports could be admitted, to rebut the government's claim by showing the jury [the ethics] reports disclosing Dimora's relationship with his alleged bribers." *Id.* And the district court told the jury that "'it's very important to the government's case to be able to indicate there wasn't any disclosure' of Dimora's political patronage." *Id.* These "facts [] are often of more importance to a jury than to an appellate judge." *Id.*

"To what extent the reports would have influenced the jury, I cannot and need not know. As appellate judges, we are not qualified to stack inference on inference for a jury. It is our job to preserve trial by jury[.]" *Id.* That is why I would vacate all of Dimora's convictions in this appeal and remand for a new trial, because the only proper fact-finding body for these issues is a properly instructed jury that considers Dimora's ethics reports—not appellate judges and not a district court reviewing a 30,000 page record of a 37-day trial it heard 8 years ago.

I respectfully dissent.